**Steven M. ASHERMAN,
Petitioner–Appellee,**

v.

**Larry MEACHUM, Commissioner, Connecticut Department of Correction,
Respondent–Appellant.**

**No. 002, Docket 90–2530.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 10, 1991.

Decided Feb. 13, 1992.

Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn. (Richard Blumenthal, Atty. Gen., Steven R. Strom, Asst. Atty. Gen., on the brief), for respondent-appellant.

William J. Tracy, Jr., Bristol, Conn. (Furey, Donovan, Eddy, Kocsis, Tracy & Daly, on the brief), for petitioner-appellee.

Before OAKES, Chief Judge, and LUMBARD, MESKILL, NEWMAN, KEARSE, CARDAMONE, WINTER, PRATT, MINER, ALTIMARI, MAHONEY, WALKER and McLAUGHLIN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal was reheard in banc to reconsider the issue of whether prison officials violate the Self–Incrimination Clause of the Fifth Amendment by terminating the su-

pervised home release of a sentenced prisoner upon notification that the prisoner would refuse to answer questions about his crime at a scheduled psychiatric evaluation. The issue arises on an appeal by the Commissioner of the Connecticut Department of Correction from a judgment of the District Court for the District of Connecticut (Ellen Bree Burns, Chief Judge) granting the petition of Steven M. Asherman for a writ of habeas corpus. We hold that such action does not violate the Fifth Amendment. We therefore vacate the panel opinion that had affirmed the District Court's judgment and return the appeal to the panel for consideration of any remaining issues.

### Facts

Asherman was sentenced in 1980 to a term of seven to fourteen years by the Connecticut Superior Court after his conviction for first-degree manslaughter. His conviction was affirmed on direct review by the Connecticut Supreme Court, *State v. Asherman*, 193 Conn. 695, 478 A.2d 227 (1984), *cert. denied*, 470 U.S. 1050, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985), and a federal habeas corpus challenge to the conviction was rejected by the District Court, *Asherman v. Meachum*, 739 F.Supp. 718 (D.Conn.), *aff'd mem.*, 923 F.2d 845 (2d Cir.1990).

Asherman began serving his sentence in March 1985. In December 1987, the Connecticut Commissioner of Corrections granted his application for supervised home release (SHR). *See* Conn.Gen.Stat. 18–100(e) (1990). Asherman was released initially to a halfway house and thereafter resided with his wife in an apartment. On July 19, 1988, the Connecticut Parole Board denied Asherman's application for parole. On August 19, 1988, the Commissioner instructed Asherman to report to the Commissioner's office for a psychiatric evaluation. The Commissioner later testified that he was "concerned about what this [parole] denial may mean in terms of [Asherman's] mind, and his behavior."

On August 22, 1988, Asherman's attorney wrote the Commissioner, stating that Asherman would not "participate in any interrogation which is related to the crime for which he was charged." The federal habeas corpus petition challenging the conviction was then pending in the District Court. When Asherman reported as ordered, he was returned to confinement within the state prison system.

Thereafter, a prison disciplinary board determined that Asherman had violated the terms of his SHR and should be removed from SHR status. The Commissioner subsequently reversed the determination of a disciplinary violation, but confirmed the termination of SHR status. In a written explanation of his reasons, the Commissioner stated:

> Your refusal to fully participate in this psychiatric evaluation precludes me from obtaining information necessary to determine whether the ... conclusion of the Board of Parole affected you to the point where you no longer are a suitable person for home release status.

> The absence of the information referred to ... constitutes sufficient ground for determining that you no longer are a suitable person for home release status.

Thereafter a state court habeas corpus challenge to the SHR termination resulted in Asherman's temporary return to SHR status, but that reprieve was ended when the Connecticut Supreme Court rejected the habeas corpus challenge. *See Asherman v. Meachum*, 213 Conn. 38, 566 A.2d 663 (1989). Asherman then renewed his challenge to the SHR termination by bringing the pending habeas corpus challenge in the District Court. The District Court granted relief on the ground that the termination of Asherman's SHR status had violated his self-incrimination privilege, a panel of this Court affirmed, *Asherman v. Meachum*, 932 F.2d 137 (2d Cir.1991), and a rehearing in banc was ordered.

### Discussion

The issue presented, though important, is rather narrow. It concerns the extent to which state officials may take adverse administrative action in response to a refusal to answer questions under circumstances

where the answers might tend to incriminate but are also relevant to the proper exercise of state authority. In resolving that issue, we are willing to make several assumptions for purposes of this case. First, we assume, without deciding, that the answers to the questions Asherman refused to answer created a risk of self-incrimination. In saying that, we are not deciding whether, had Asherman responded to questions about his crime, the State may lawfully use such answers against him in any criminal proceeding. We assume only that Asherman reasonably apprehended a risk of self-incrimination, sufficient to warrant his assertion of the privilege. Second, we assume, without deciding, that Asherman's challenge to the revocation of SHR status may be challenged in a habeas corpus proceeding, *cf. Brennan v. Cunningham*, 813 F.2d 1, 4 (1st Cir.1987) (challenge to revocation of work release). Third, we assume, without deciding, that the adverse state court decision in Asherman's habeas corpus challenge to the termination of his SHR status has no *res judicata* effect upon his pending federal court habeas challenge.

■ The Supreme Court has issued a series of decisions that guides our resolution of this appeal. First, the Court has made clear that a person cannot be compelled to be a witness against himself in a criminal proceeding nor forced "to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). Thus, on the assumptions we have made for purposes of this case, Asherman could not have been ordered to answer questions concerning his crime, by which we mean only that he could not have been subjected to a court order directing him to answer and punished with contempt penalties for refusing to obey such an order. Nor could he have been ordered to waive his self-incrimination privilege. *See Gardner v. Broderick*, 392 U.S. 273, 279, 88 S.Ct. 1913, 1916–17, 20 L.Ed.2d 1082 (1968).

■ Second, the Court has ruled that in some circumstances adverse state action may not be taken as a consequence of a person's invocation of the self-incrimination privilege. *See Slochower v. Board of Higher Education*, 350 U.S. 551, 558–59, 76 S.Ct. 637, 641–42, 100 L.Ed. 692 (1956). Without endeavoring to describe the full range of such circumstances, we may observe that a state may not take adverse action in response to an invocation of the privilege in response to questions not reasonably related to the valid exercise of state authority. *Slochower* well illustrates the point. A city was prevented from terminating the services of a college teacher in response to the teacher's assertion of his self-incrimination privilege while being questioned by a congressional committee.

Third, the Court has ruled that in some circumstances adverse state action may be taken upon a person's refusal to answer questions pertinent to the exercise of state administrative authority. *See Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Gardner v. Broderick, supra*. Since these two decisions are especially pertinent to the pending appeal, we examine them in some detail.

Both decisions concern municipal employees who were questioned about corruption in their agencies. The police officer in *Gardner* was brought before a grand jury and asked to sign a waiver of the immunity that otherwise might have been conferred under state law had he testified. *See* N.Y.Penal Law § 2447 (1953), *repealed by* N.Y.Penal Law § 500.05 (McKinney 1967). He was discharged from public employment for his refusal to waive immunity. The fifteen sanitation workers in *Uniformed Sanitation Men* were brought before a hearing conducted by a commissioner of investigations. They were told that their answers could be used against them in a court of law. 392 U.S. at 283 n. 4, 88 S.Ct. at 1919 n. 4. Three answered the questions and were subsequently brought before a grand jury and asked to sign

waivers of immunity. Twelve refused to answer, invoking their privilege against self-incrimination. All fifteen were discharged.

The Supreme Court held all the discharges to be unconstitutional. In both decisions, the Court was careful to distinguish between permissible questioning and impermissible impairment of constitutional rights. In *Gardner,* the Court said:

> [The police officer] was discharged from office, not for failure to answer relevant questions about his official duties, but for refusal to waive a constitutional right.... He was dismissed solely for his refusal to waive the immunity to which he is entitled if he is required to testify despite his constitutional privilege.

392 U.S. at 278, 88 S.Ct. at 1916. In *Sanitation Men,* the Court said:

> "[The sanitation workers] were not discharged merely for refusal to account for their conduct as employees of the city. They were dismissed for invoking and refusing to waive their constitutional right against self-incrimination."

392 U.S. at 283, 88 S.Ct. at 1919. With the three workers who answered, the impairment arose, as with the police officer in *Gardner,* because the discharge was based on a refusal to waive immunity. With the twelve workers who declined to answer, the impairment arose because they were explicitly told that their answers could be used against them. And the Court concluded that it was clear that the City was not merely seeking an account of their public functions, but was seeking "testimony from their own lips which, despite the constitutional prohibition, could be used to prosecute them criminally." *Id.* at 284, 88 S.Ct. at 1919–20. However, the Court carefully preserved the authority of public agencies to discharge employees for refusing to answer relevant inquiries:

> Petitioners as public employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination [citing cases]. At the same time, petitioners, being public employees, *subject them-*

*selves to dismissal if they refuse to account for their performance of their public trust,* after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights.

*Id.* at 284–85, 88 S.Ct. at 1919–20.

The distinction drawn by the Court was critical for the concurring Justices:

> I find in these opinions a procedural formula whereby, for example, public officials may now be discharged and lawyers disciplined for refusing to divulge to appropriate authority information pertinent to the faithful performance of their offices.

*Id.* at 285, 88 S.Ct. at 1920 (Harlan, J., with whom Stewart, J., joins, concurring).

■ What clearly emerges from these decisions is both a limit and a grant of power with respect to governmental inquiries. Public agencies may not impair the privilege against self-incrimination by compelling incriminating answers, or by requiring a waiver of immunity, or even by asking incriminating questions in conjunction with an explicit threat to use the answers in criminal proceedings. But public agencies retain the authority to ask questions relevant to their public responsibilities and to take adverse action against those whose refusal to answer impedes the discharge of those responsibilities. The fact that a public employee might face the unpleasant choice of surrendering his silence or losing his job is no bar to an adverse consequence so long as the consequence is imposed for failure to answer a relevant inquiry and not for refusal to give up a constitutional right. The Supreme Court left public employees facing this choice without ruling definitively as to the effect of the choice upon governmental use of any responses the employee elected to give. *See Gardner,* 392 U.S. at 278–79, 88 S.Ct. at 1916–17; *Sanitation Men, id.* at 284, 88 S.Ct. at 1919–20.

■ Applying the teaching of these decisions to Asherman's case, we conclude that the Commissioner was entitled to revoke Asherman's SHR status for his refusal to discuss his crime. The inquiry was rele-

vant to the Commissioner's public responsibilities. He was entitled to conduct periodic reviews of Asherman's suitability for home release, and he was entitled to assess the impact of parole denial upon Asherman's mental health. Asherman's attempt to foreclose all questions about his crime prevented the Commissioner from pursuing a relevant inquiry. In pursuing the inquiry, the Commissioner took no action to impair Asherman's self-incrimination privilege. He sought no court order compelling answers, he did not require a waiver of immunity, and he did not insist that Asherman's answers could be used against him in a criminal proceeding. He stayed well within the authority outlined by *Gardner* and *Sanitation Men* by conducting a relevant inquiry and then taking appropriate adverse action, not for Asherman's invocation of his constitutional rights, but for his failure to answer a relevant inquiry. In Justice Harlan's terms, just as public officials may be discharged and lawyers disciplined "for refusing to divulge to appropriate authority information pertinent to the faithful performance of their offices," *Sanitation Men*, 392 U.S. at 285, 88 S.Ct. at 1920, a prisoner may be terminated from home release status for refusing to divulge to a corrections commissioner information pertinent to the administration of a home release program.

We have no occasion to consider what adverse use might have been made of Asherman's answers. *See Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (testimony given under threat of discharge for not answering may not be used in subsequent prosecution). We decide only that, even assuming he had a privilege to prevent being compelled to answer, his home release status could be terminated upon his refusal to answer questions about his crime.

■ Having determined the issue that occasioned the in banc rehearing and having rejected the ground on which the panel rested its affirmance of the District Court's judgment, we face the choice of deciding the remaining issues tendered by the appellee in support of the judgment or returning the appeal to the panel for consideration of the remaining issues. We elect to return the appeal to the panel. In banc reconsideration is a cumbersome procedure that should not be used more extensively than is necessary and useful. Obviously, judicial resources are needlessly used if all thirteen members of this in banc court are obliged to consider issues that can be expeditiously resolved by a panel of three judges. The possibility that the panel's resolution of the remaining issues would precipitate renewed in banc consideration is too remote to be taken seriously. In leaving remaining issues for the panel, we inject no additional layer into the judicial process; we merely permit the normal second layer—a court of appeals panel—to perform its customary role.

On several occasions we have chosen to confine in banc consideration to less than all of the issues in a case by granting rehearing limited to one or more specified issues, *see United States v. Chestman*, 947 F.2d 551, 554 (2d Cir.1991) (in banc) (in banc granted only on issues concerning Rule 14e–3(a), Rule 10b–5, and mail fraud), *petition for cert. filed*, (U.S. Jan. 2, 1992) (No. 91–1085); *United States v. Indelicato*, 865 F.2d 1370, 1385 (2d Cir.) (in banc) (in banc granted only on issue of sufficiency of evidence to establish RICO pattern), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989), *New York v. 11 Cornwell Co.*, 718 F.2d 22, 24 (2d Cir.1983) (in banc) (in banc granted only on State's cross-appeal for attorney's fees); *Daye v. Attorney General*, 696 F.2d 186, 190 (2d Cir.1982) (in banc) (in banc granted only on issue of exhaustion of state remedies); *Farrand Optical Co. v. United States*, 317 F.2d 875, 885–86 (2d Cir.1962) (in banc) (in banc granted only on issue of district court jurisdiction). Where this occurred and issues remained after the in banc court's consideration of the limited issue, the in banc court left the issues that remained for further consideration by the original panel. *See Indelicato*, 865 F.2d at 1385; *Farrand*, 317 F.2d at 886.

■ The fact that the in banc court is authorized to resolve "[c]ases and contro-

versies," *see* 28 U.S.C. § 46(c) (1988), or an "appeal," *see* Fed.R.App. 35(a), does not preclude the court from electing to use less than all of the authority conferred upon it. The same reasoning has evidently persuaded the Supreme Court that it may limit its consideration on certiorari to specific questions despite the statutory grant of jurisdiction to review "[c]ases," 28 U.S.C. § 1254(1) (1988 & Supp. I 1989), *see, e.g., Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311 (1976), and has persuaded our Court that it may grant a certificate of probable cause limited to a single issue despite the statutory grant of jurisdiction over an "appeal," 28 U.S.C. § 2253 (1988), *see Vicaretti v. Henderson,* 645 F.2d 100 (2d Cir.), *cert. denied,* 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171 (1981). Since the in banc court may elect at the outset to rehear a limited issue in an appeal, it may equally well elect to do so during the course of its in banc consideration of the appeal.

We therefore vacate the panel opinion and return the appeal to the panel for further consideration of any remaining issues and disposition in light of this opinion and the panel's resolution of those issues.

MINER, Circuit Judge, concurring:

I concur in the majority opinion as far as it goes. My problem with it is that it does not go far enough because it does not dispose of *all* the issues raised on the appeal. I am of the opinion that the appeal should be decided in its entirety by the in banc court convened to hear it. The issues remaining unresolved by the majority opinion should not be returned to the panel for consideration. There is a legal basis as well as a pragmatic basis for this proposition.

We are constrained to hear and determine cases and controversies by a court of three judges, "unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in regular active service." 28 U.S.C. § 46(c). According to the Federal Rules of Appellate Procedure; "[a] majority of the circuit judges who are in regular active service may order that an appeal or other proceeding be heard or reheard by the court of appeals in banc." Fed. R.App.P. 35(a). Whether the matter before the in banc court is denominated a case, a controversy, or an appeal, the statute and rule contemplate a full resolution of all issues. An in banc court, once constituted, supplants the panel and proceeds to a direct review of the district court's judgment. *See Drake Bakeries Inc. v. American Bakery & Confectionery Workers International,* 294 F.2d 399 (2d Cir.) (per curiam) (in banc), *aff'd,* 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1961). Ultimately, it supplants the panel's opinion with its own. Accordingly, the in banc court on rehearing is called upon to perform the principal function first assigned to the panel in the determination of all issues properly raised on appeal.

I am much persuaded by the reasoning of Judge Waterman (in dissent, unfortunately) in *Farrand Optical Co. v. United States,* 317 F.2d 875 (2d Cir.1963) (in banc). Judge Waterman wrote that it seemed obvious to him

that the in banc court having supplanted the panel, the "unless" clause in 28 U.S.C. § 46(c) commands that the in banc court hear and determine all the undetermined issues remaining undisposed of in this controversy. No language in the statutes dealing with Courts of Appeals, 28 U.S.C. §§ 41–48, and no precedent, can be found that justifies an in banc court that has partially heard a case ordering a remand, or a reference, of that case to a displaced panel in order for that panel to determine issues the in banc court did not wish to determine.

*Id.* at 886. Despite the lapse of thirty years and the Court's continued acceptance of the limited issue approach, *see, e.g., United States v. Indelicato,* 865 F.2d 1370, 1371 (2d Cir.) (in banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 25 (1989), Judge Waterman's reasoning maintains its vitality and should be adopted by the Court.

Aside from the force of the legal argument that militates against a remand of

undecided issues to the panel, considerations of judicial economy at this point in time very much favor resolution of the entire appeal by the in banc court. The demands of our ever-increasing caseload are well known and need not be recounted here. *See, e.g.,* Meskill, *Caseload Growth: Struggling to Keep Pace,* 57 Brook.L.Rev. 299 (1991). Suffice it to say, the caseload in the Second Circuit Court of Appeals has been trending upward for many years. Over the past three years alone, the number of cases filed has increased from 2,942 in 1988 to 3,172 in 1989, to 3,424 in 1990, to 3,511 in 1991. *See* U.S. Courts for the Second Circuit, *Second Circuit Reports* for 1989, 1990 and 1991. Every member of the Court is aware of the fact that 1992 filings already are outpacing 1991 filings by a large margin. This is no time to make extra work for the Court.

The pragmatic reason for adopting an "all issues" approach is a powerful one, because it speaks to the conservation of scarce judicial resources in the face of overwhelming demands. The author of the majority opinion has written that the in banc process generally "is a cumbersome one that places a severe strain on judicial resources already considerably overburdened." Newman, *In Banc Practice in the Second Circuit: The Virtues of Restraint,* 50 Brook.L.Rev. 365, 382 (1984). The majority opts for a process even more cumbersome and a strain even more severe. It cannot be denied "that an in banc is not an efficient procedure in the litigation process. It injects a fourth layer into a system that already provides first instance determination in the trial court, mandatory appellate review by a panel of the court of appeals, and the opportunity for discretionary review by the Supreme Court." Newman, *In Banc Practice in the Second Circuit, 1984–1988,* 55 Brook. L.Rev. 355, 369 (1989). Why my colleagues would add a fifth, and possibly a sixth, seventh or eighth layer into the system is difficult to understand.

There is another "downside" involved in the piecemeal approach to appellate decision-making. The time spent in bouncing issues back and forth between panel and in banc court like so many ping pong balls needlessly delays the ultimate termination of the case to the point of denying to the litigants the just, speedy and inexpensive determination of their appeals to which they are entitled. It goes without saying that time and money are important factors in all litigation, and we shirk our duties if we fail to grasp the opportunity to shorten the time and save money for litigants in the process of achieving a just result. If piecemeal review is to be avoided in appeals to the courts of appeals because of inconvenience and cost, *see Dickinson v. Petroleum Conversion Corp.,* 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950), it surely should be avoided for the same reasons in the decision-making process *within* the courts of appeals.

The Court's in banc order of June 17, 1991 did not restrict the in banc rehearing in this case to the Fifth Amendment issue. In fact, the parties briefed and argued, in addition to the Fifth Amendment issue, the due process, equal protection and First Amendment claims of petitioner-appellee, Steven M. Asherman. I have formed an opinion as to each of the three claims my colleagues in the majority choose to leave unresolved and have communicated my views to each member of the court. Out of institutional and collegial concerns, however, I do not set forth those views here. After all, I may have the opportunity to do so on the second rehearing in banc in this case ... or the third ... or the fourth.

LUMBARD, Circuit Judge, dissenting in part:

I dissent from the opinion of the majority to the extent it vacates the decision of the original panel. Once again I would have affirmed the judgment of the District Court. I agree that the court *en banc* need not resolve every question presented in an appeal and may properly return any remaining issues to the panel.

CARDAMONE, Circuit Judge, dissenting:

I respectfully dissent from the *en banc* majority because its result threatens the

foundation of the Fifth Amendment privilege against self-incrimination. The Commissioner's authority to conduct a legitimate inquiry into Steven M. Asherman's continued suitability for Home Release Status is not disputed. Yet, contrary to the import of the majority opinion, the Fifth Amendment does not simply yield in the face of a relevant inquiry, but instead is a fundamental limitation on a governmental agency's ability to conduct such an inquiry. If the Fifth Amendment means anything at all, it demands in this case that Asherman not have his Home Release Status terminated solely on account of the invocation of his constitutional privilege.[1] By sanctioning this result—on the subtle ground that his answers are relevant to an administrative inquiry—the majority greatly disserves judicial precedents construing the language of this Amendment broadly, and ignores the long history of cruel punishments inflicted on recalcitrant witnesses that led to its adoption in our Bill of Rights.

## I

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides in relevant part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The privilege "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). If an individual asserts the privilege, "he 'may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him' in a subsequent criminal proceeding." *Minnesota v. Murphy*, 465 U.S. 420, 429, 104

S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984) (quoting *Maness v. Meyers*, 419 U.S. 449, 473, 95 S.Ct. 584, 598, 42 L.Ed.2d 574 (1975) (White, J. concurring in result)) (emphasis in original).

Thus, simply put, the Fifth Amendment requires that unless an individual is given immunity at the time of his testimony, he may not be confronted with the dilemma of either answering questions that may tend to incriminate him or being penalized solely for the assertion of his constitutional privilege. Here, Asherman was not offered immunity. Hence, because, as the majority assumes, the answers to the *only* questions to which Asherman refused to respond— those relating to the crime for which his *habeas corpus* appeal was pending—created a risk that he would be "a witness against himself" in the new trial he might obtain, Asherman was entitled to invoke the Fifth Amendment privilege. And it is clear from the record that it was the invocation of this constitutional right that was the sole basis for which Asherman was reimprisoned. This is plain from the Commissioner's letter to Asherman explaining the revocation of his Home Release Status. There he stated that Asherman's "refusal to fully participate" in the psychiatric evaluation—that is, by invoking the Fifth Amendment with regard to questions relating to the crime—prevented the Commissioner from obtaining information relating to Asherman's continued eligibility, and the absence of that information constituted "sufficient ground for determining that [he] no longer [was] a suitable person for home release status." Consequently, Asherman was punished solely for the invocation of his constitutional right—a manifest violation of a citizen's right to remain silent.

It must be emphasized, as it was in the original panel opinion, that the result compelled by the Fifth Amendment in this case in no way forecloses the Commissioner from conducting a legitimate evaluation of

---

**1.** By letter dated February 11, 1992, the Attorney General of the State of Connecticut notified this Court "that Steven Asherman completed service of his sentence on February 11, 1992 and, as of this date, was discharged from the custody of the Connecticut Commissioner of Correction."

Asherman's continued suitability for Home Release Status, and in fact reimprisoning him if an adverse determination is made on the basis of this evaluation. Petitioner may properly be required to answer any relevant inquiry not involving the risk of self-incrimination, and if he refuses to do so or if the answers to that inquiry cast doubt on his suitability, his status can be revoked on that basis. In fact, the Commissioner is entitled to draw an adverse inference from Asherman's silence regarding the crime if after a grant of immunity he refuses to testify, *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976), or if the decision to reimprison him is not based *solely* on his silence. *Id.* at 317–18, 96 S.Ct. at 1557–58. What the Fifth Amendment forbids is exactly what occurred in this case—adverse action taken solely as a result of the invocation of the privilege against self-incrimination. *See id.* at 318, 96 S.Ct. at 1557–58.

## II

Ironically, while the majority acknowledges that "Asherman could not have been ordered to answer questions concerning his crime," they allege that "the Commissioner took no action to impair Asherman's self-incrimination privilege," because "[h]e sought no court order compelling answers, he did not require a waiver of immunity, and he did not insist that Asherman's answers could be used against him in a criminal proceeding." This analysis simply mischaracterizes Fifth Amendment jurisprudence. It cannot seriously be contended that the actions listed above are necessary for the finding of a Fifth Amendment violation. All that is required is that the governmental agency "sought to induce [an individual] to forego the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'" *Murphy*, 465 U.S. at 434, 104 S.Ct. at 1145–46 (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977)).

Moreover, the very cases relied upon by the majority do not support its novel proposition, but instead compel the opposite conclusion; that is, Asherman's Home Release Status was revoked in violation of the Fifth Amendment. The Supreme Court, interpreting *Uniformed Sanitation Men Ass'n Inc. v. Commissioner of Sanitation*, 392 U.S. 280, 283–84, 88 S.Ct. 1917, 1919–20, 20 L.Ed.2d 1089 (1968) and *Gardner v. Broderick*, 392 U.S. 273, 278–279, 88 S.Ct. 1913, 1916–17, 20 L.Ed.2d 1082 (1968), explicitly stated that "[t]hese cases make clear that 'a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.'" *Murphy*, 465 U.S. at 434, 104 S.Ct. at 1145–46 (quoting *Lefkowitz v. Cunningham*, 431 U.S. at 805, 97 S.Ct. at 2135–36). The holding of those cases is that the employees were presented with an impermissible "choice between surrendering their constitutional right or their jobs." *Uniformed Sanitation Men*, 392 U.S. at 284, 88 S.Ct. at 1919–20.

Here, Asherman was likewise confronted with an impermissible choice—between surrendering his right to refuse to answer questions relating to the crime or losing his Home Release Status due to the absence of those answers. It seems to me uncontrovertible that reimprisonment solely on the basis of a refusal to answer incriminating questions constitutes the unlawful imposition of "substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." To my mind, there could be no clearer violation of the Self-Incrimination Clause.

In fact, in *Murphy*, the Supreme Court stated that "[o]ur decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." 465 U.S. at 438, 104 S.Ct. at 1148. It is difficult to fathom, then, how the majority can conclude that the revocation of Asherman's Home Release Status—also resulting in reimprisonment—on the basis of the invocation of his constitutional privilege is permissible. Just as is the case with revocation of parole, the revocation of Asherman's Home

Release Status is a "classic penalty situation," *id.* at 435, 104 S.Ct. at 1146, foreclosed by the Fifth Amendment.

The majority makes a tortured attempt to disregard the result compelled by this Amendment, boldly asserting that the adverse action taken was "not for Asherman's invocation of his constitutional rights, but for his failure to answer a relevant inquiry." This is a distinction without a difference where, as here, the two are inextricably intertwined. Asherman's failure to answer a relevant inquiry was solely and directly the result of his invocation of the right to remain silent. In other words, his assertion of right did not constitute a complete refusal to respond to relevant questions, as evidenced by his appearance at the appointed time to undergo the evaluation; instead Asherman refused to respond only insofar as to do so could incriminate him.

Thus, the clear import of the majority decision can only be that when "answers might tend to incriminate but are also relevant to the proper exercise of state authority," the relevant inquiry trumps the Fifth Amendment. This simply cannot be the correct way to construe the constitution. It is axiomatic that to constitute a proper exercise of state authority a governmental inquiry must not violate the Constitution. The majority reverses this fundamental proposition, insisting that in this case Asherman's Fifth Amendment privilege against self-incrimination must give way to a relevant governmental inquiry. The absurdity of this result is plain in its recitation—the Fifth Amendment dissolves in the face of a relevant governmental inquiry.

The majority states in support of its result that *Uniformed Sanitation Men* and *Gardner* "carefully preserved the authority of public agencies to discharge employees for refusing to answer relevant inquiries." While this is true as far as it goes, the majority's result ignores the very holdings of these cases—that adverse action may be taken for failure to answer even relevant inquiries *only* when those inquiries "do not involve an attempt to coerce [individuals] to relinquish their constitutional rights," *i.e.,* answer questions that may tend to incriminate them. *Uniformed Sanitation Men* 392 U.S. at 285, 88 S.Ct. at 1920. Undeniably, in both cases the inquiries were relevant to the employment. *Nonetheless,* in each of the cases, the Supreme Court *held* that termination of employment based on the assertion of the Fifth Amendment privilege was unconstitutional. It is these holdings that constitute the legal authority on which this dissent is premised. The constitutional violations occurred because "[the employees] were not discharged *merely* for refusal to account for their conduct as employees of the city. They were dismissed for invoking and refusing to waive their constitutional right against self-incrimination." *Id.* at 283, 88 S.Ct. at 1919 (emphasis added).

The distinction, it seems to me, is clear. Thus, for example, if the employees refused to answer questions about their conduct that did not involve the risk of self-incrimination, or if immunity had been supplied, any discharge would be based "merely" on refusal to account for conduct as employees, and would be permissible. But when refusal is based on a legitimate invocation of the right against self-incrimination, *i.e.,* where the answer could subject them to criminal penalty, the Fifth Amendment is implicated and the discharge is *not* "merely" based on refusal to account for conduct as employees. Instead, dismissal is based on the invocation of a constitutional right, and this right predominates over the government's interest in the inquiry.

In *Lefkowitz v. Turley* the Supreme Court explained the distinction made in *Uniformed Sanitation Men* and *Gardner* between the ability of the state to take adverse action on the basis of a mere refusal to answer a relevant inquiry and the unconstitutionality of such action when Fifth Amendment rights come into play:

> [T]he accommodation between the interest of the State and the Fifth Amendment requires that the State have means at its disposal to secure testimony *if immunity is supplied* and testimony is still refused.... *[G]iven adequate immunity, the State may plainly insist that em-

ployees either answer questions under oath about the performance of their job or suffer the loss of employment.... [However] the State must recognize what our cases hold: that answers elicited upon the threat of loss of employment are compelled and inadmissible in evidence. Hence, *if answers are to be required in such circumstances States must offer to the witness whatever immunity is required to supplant the privilege* and may not insist that the employee ... waive such immunity.

414 U.S. at 84–85, 94 S.Ct. at 325–26 (emphasis added). The rule that a governmental inquiry, *no matter how relevant,* must not contravene the protection of the Fifth Amendment could not be stated more clearly. Consequently, without a grant of immunity, a governmental agency cannot take adverse action for an individual's failure to answer even relevant questions that may tend to incriminate him. This notion is the gravamen of the Fifth Amendment privilege, and the majority opinion contravenes this fundamental constitutional principle.

### III

When a court construes a statute, it examines legislative history. When it construes one of the Amendments contained in our Bill of Rights, it must turn to human history. This case may not be reviewed in proper context without considering in some detail the history leading to the adoption of the Fifth Amendment. That we enjoy an accusatorial rather inquisitorial system of criminal justice is not a fortuitous happenstance. History reveals there would be no Fifth Amendment if over a period of 800 years certain men and women had not suffered cruel punishments, which mobilized public opinion against oppressive official action aimed at extracting confessions from the mouth of the accused. The passage of time, the Supreme Court has noted in analyzing the Fifth Amendment, has "not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit." *Ullmann v.*

*United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956). Justice Holmes' aphorism in *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921), that "a page of history is worth a volume of logic" is, as Justice Frankfurter observed, peculiarly true with respect to the right to remain silent. *Ullmann,* 350 U.S. at 438, 76 S.Ct. at 506–07.

In the twelfth century Henry II of England (1154–1189) laid the early foundation for accusational prosecution by extending the then 400–year–old "inquiry of neighbors," an ancestor of the jury system. At that same time Pope Innocent III (1198–1216) devised the inquisitional technique. The two systems differed in at least one fundamental respect: under the accusatory, the investigating officials developed the case from sources other than the accused; under the inquisitory, the same officials obtained their case from the mouth of the accused. Under an edict of the Fourth Lateran Council of 1215–16, an ecclesiastical official could make a person swear to tell the truth to the full extent of his knowledge as to any matter about which he was questioned. *See* O. John Rogge, *The First and the Fifth,* 140–41 (1960) (Rogge). This is precisely the kind of testimony Asherman was directed by Meachum to give in the instant case.

Although the inquisitional method was used originally in England and on the Continent to pursue heretics, its use spread in the thirteenth century to the English Courts of Common Pleas and King's Bench, *id.* at 147, and continued to grow until the time of Elizabeth I, when popular opposition to the oppressiveness of the inquisitional technique led to the Act of Supremacy (1558), which barred the Church from using this procedure. *Id.* at 151.

During the 1600s Edward Coke (1552–1634) became Chief Justice of the Court of Common Pleas by order of King James I (1566–1625), but later fell out of the king's favor because of his insistence on the supremacy of the law over the royal prerogative. In *Burrowes* case, while sustaining a writ of prohibition against the High Com-

mission Court that wanted to use the oath *ex officio* (the inquisitorial oath) and releasing those held by that court on bail, Coke wrote: "the statute of I Eliz. is a penal law, and so they are not to examine one upon oath upon this law; thereby to make him to accuse himself ..." *Id.* at 163–70; 8 *Wigmore on Evidence*, § 2250 at 280–282 (McNaughton rev. 1961).

The growing use of the accusatorial system in England must be contrasted with the oppressive power of the inquisitional system on the Continent in the same century. This is well-illustrated by the case of Galileo Galilei, then a 70–year citizen of Florence, Italy. He was taken before the Inquisition in Rome in 1633 to answer for the "Dialogue", a book he had authored 17 years earlier. In this book, Galileo—perhaps the greatest living scientist and mathematician of his day—had stated that the doctrine proposed by Copernicus, which asserted the immobility of the sun and the movement of the earth around the sun, was correct, even though according to the Church's prelates the doctrine contradicted the literal meaning of certain Biblical passages. Galileo was given the choice of either renouncing his 50 years of life's work by retracting what he had written or taking the Inquisitional Oath and thereby possibly subjecting himself to torture as a heretic. Under these cruel alternatives he confessed his "error," for which he was sentenced to life in prison. *See* Zsolt de Harsanyi, *Galileo and the Inquisition* (1939).

In 1637 one John Lilburne, a Puritan, was taken before the Star Chamber on a charge of importing seditious books from Holland. For his refusal to answer certain questions he was fined, whipped and pilloried. While in the pillory Lilburne made a speech in which he said the inquisitional oath *ex officio* was "an oath against the law of the land.... [I]t is absolutely against the law of God, for that law re-

quires no man to accuse himself." Christ himself, said Lilburne, would not accuse himself, but in response to his accusers said: "Why ask me? Go to them that heard me." Rogge at 171–73. *See* John 18:21–22 (Ronald Knox ed.). A thousand or more years before, as part of the ancient Jewish law, there is found in the Talmud the Hebrew equivalent of the Latin maxim *nemo tenetur seipsum prodere*, "no one is bound to betray himself." L. Levy, *Origins of the Fifth Amendment*, Appendix at 434 (1968) (Levy).[2]

Three years later, in 1640, the Long Parliament convened and a petition for Lilburne's release was passed. The Star Chamber and the High Commission were abolished, and the oath *ex officio* as an ecclesiastical procedure was banned. 8 *Wigmore on Evidence*, § 2250 at 283–84. While most of the agitation had been directed at ecclesiastical courts, after the Lilburne case and the reforms of the Long Parliament it began to be flatly asserted in common law trials that no person was bound to incriminate himself on any charge or in any court. *Id.* at 289. By 1660 the right against self-incrimination was broadly established and extended not only to the accused, but also to witnesses. *Id.* at 290.

In colonial America, this common law history took root. In Virginia in 1677 the House of Burgess declared that "noe law can compel a man to sweare against himselfe in any matter wherein he is lyable to corporall punishment." Rogge at 180. But the road toward attaining a privilege against self-incrimination in the colonies was not without dramatic detours: The Salem Witch trials of 1692, which resulted in defendants being burned at the stake, are a prime example of torture and death being used against a recalcitrant witness who refuses to confess. *See* M. Berger, *Taking the Fifth*, 21–22 (1980) (Berger).

Virginia's *Declaration of Rights*, a preface to the 1776 Virginia Constitution au-

---

**2.** The Puritan minister John Udall was tried for seditious libel at common law and asked to take an oath and answer the question whether he wrote the book *Demonstration of Discipline* which was published in 1589, and when he declined to answer the judges of the Court of High Commission, an ecclesiastical court, ar-

gued his guilt to the jury. *See* Levy at 150–70. As one commentator has put it, following Udall's conviction and sentence to hang, "Udall rotted away in prison and died...." *See* Oakes, The Proper Role of the Federal Courts in Enforcing the Bill of Rights, 54 N.Y.U.L.Rev. 911, 919–20 (1979).

thored by George Mason, included the right to silence. Levy at 405. Eight of the other Colonies followed the basic formulation in their own constitution requiring no man to be "compelled to give evidence against himself." *Id.* at 409. Nonetheless, at the Constitutional Convention there were dark warnings that nothing in the initial draft prevented Congress from establishing "that diabolical institution, the Inquisition," *id.* at 417, and perhaps repeating "the history of the inquisitions of the Star Chamber Court of England." *Id.* at 419. Thus, in 1789 James Madison drafted the Fifth Amendment drawing on Mason's *Declaration of Rights*. When the Bill of Rights was ratified in 1791 the enshrinement of the ancient maxim *nemo tenetur* into a constitutional right to remain silent was completed. *See* Berger at 23. That the Self–Incrimination Clause was included in the Fifth and not the Sixth Amendment—which Amendment, referring to the "accused," protected that person alone—required that it be given a broader reading, one not restricted to a criminal defendant only, nor only to occasions when a defendant was on trial. *See* Levy at 427.

### IV

When the Fifth Amendment was included in the Bill of Rights, the history just recited was in the forefront of the minds of its drafters. This history, to my mind, must neither be forgotten nor ignored. The majority opinion takes a step backward in the continuing struggle to maintain this precious right. It simply abrogates the protection of the Self–Incrimination Clause—as construed by Supreme Court decisions—by permitting the revocation of Asherman's Home Release Status solely on the basis of his refusal to answer incriminating questions. Because the right to remain silent must be upheld, even in the face of administrative relevance, I dissent.[3]

---

3. The majority has directed the remaining issues be returned to the original panel for it to consider. In my view, the *en banc* court has the legal authority to make that direction and has done so properly in this case.