STATE of Minnesota, ex rel. Randy MORROW, Respondent,

v.

Gothriel LaFLEUR, Commissioner of Corrections, petitioner, Appellant.

No. C7–98–323.

Supreme Court of Minnesota.

April 15, 1999.

Michael A. Hatch, Minnesota Attorney General, Sara DeSanto, Asst. Attorney General, St. Paul, for appellant.

Bradford Colbert, Legal Assistance to Minnesota Prisoners, St. Paul, for respondent.

## OPINION

LANCASTER, J.

This appeal presents the issues of whether the Commissioner of Corrections violated respondent Randy Morrow's due process rights or privilege against self-incrimination by imposing a disciplinary sanction for failing to participate in and complete a sex offender treatment program. The case comes to us on the Commissioner's appeal of a decision of the court of appeals which reversed the district court's denial of Morrow's petition for writ of habeas corpus and concluded that the Commissioner violated Morrow's due process rights and his Fifth Amendment privilege against self-incrimination. See State ex rel. Morrow v. LaFleur, 577 N.W.2d 226 (Minn. App.1998). We reverse the court of appeals and hold that the Commissioner's decision to impose a disciplinary sanction for failure to participate in and complete a sex offender treatment program violated neither Morrow's substantive due process rights nor his Fifth Amendment privilege.

In 1996, Morrow was convicted of fourth-degree criminal sexual conduct pursuant to Minn.Stat. § 609.345, subd. 1(b) (1998). The trial court sentenced Morrow to 36 months of imprisonment and 10 years of extended supervised release for criminal sexual contact with a 13–year–old boy. The facts underlying Morrow's conviction are contained in the unpublished court of appeals' decision affirming his conviction. See State v. Morrow, No. C4–96–1702, 1997 WL 309453 (Minn.App. June 10, 1997), pet. for rev. denied (Minn. Oct. 14, 1997). Briefly stated, the relevant facts underlying his conviction are: In the fall of 1995 Morrow moved to Lakeville, Minnesota, where he was employed delivering newspapers. Morrow paid neighborhood boys to help him with the deliveries and he often would allow the boys who helped him to spend the night in his house. The boys slept in various places, including Morrow's bed. The boys spent much of their free time at Morrow's home playing video games and watching movies, among other activities. Morrow testified at his trial that he is affectionate and likes to hug and kiss. He stated that he showed his affection for these boys by hugging and kissing them and telling them he loved them. He kissed the older boys, including the victim, N.F., on the lips. He also gave the boys back rubs. N.F. testified that on two occasions, while Morrow was giving him a back rub, he touched N.F.'s buttocks. Morrow denied that he ever touched N.F.'s buttocks.[1]

Following his conviction, Morrow's warrant of commitment to the Commissioner of Corrections was issued on June 11, 1996. On June 24, 1996, a sex offender assessment was conducted at the Minnesota Correctional Facility at Stillwater by sex offender assessor Joseph Lee, a psychologist. Lee's report reveals that it was explained to Morrow that the purpose of the interview was to determine the most appropriate sex offender treatment for Morrow, and that the recommendation for treatment would be made by a program review team. It was further explained to Morrow that failure to complete the program review team's directive could result in discipline, including possible additional incarceration time.[2] Lee reported that

---

1. Morrow also has a 1992 criminal sexual conduct conviction. The sex offender assessment completed by the Department of Corrections indicates that after the 1992 conviction, Morrow entered the human sexuality program at the University of Minnesota as an outpatient and stayed with that program for five months. Morrow revealed to corrections staff during his incarceration for the 1996 conviction that he left the human sexuality program because of his financial problems and the recommendation of treatment staff who felt that he lacked involvement in the treatment.

2. The legislature has mandated that the Department of Corrections provide sex offender treatment. See Minn.Stat. § 241.67 (1998). The department is not required to "accept or retain an offender in a program if the offender is determined by prison professionals as unamenable to

Morrow was cooperative during the interview and that Morrow admitted portions of the offense for which he was convicted. The report states: "He denied that he touched the victim's buttocks. He denied responsibility for the offense. He denied the harm his behavior had caused the victim. He expressed no remorse for his behavior." The program review team recommended long-term intensive sex offender treatment. In order to accomplish treatment, the program review team recommended Morrow's transfer to either the Minnesota Correctional Facility at Moose Lake or the Minnesota Correctional Facility at Lino Lakes.

In April of 1997, Morrow was transferred to the sex offender program at the Lino Lakes facility to begin treatment. Morrow met with the treatment team on April 23, 1997, to discuss his appropriateness for sex offender programming at the institution. The minutes of the meeting state that Morrow was being assessed for treatment and say:

> [Morrow] fondled the buttocks, kissed the lips, and rubbed the back of a 13–year–old boy; he also slept in the same bed with the boy. Except for fondling the buttocks, subject admits all the above actions. He denies the inappropriateness of this action; nor does he regard it as harmful or illegal. Further, subject said he is currently appealing his conviction. Due to the denial of his offense, team did not see him as an appropriate candidate for SOP–LL program; team unanimously voted for his termination.

The legislature has provided that a person incarcerated on a sex offense may be directed to appropriate treatment and failure to comply with treatment can be grounds for institutional disciplinary action. *See* Minn. Stat. § 241.67, subd. 3(a) (1998). Morrow's file contains an "amended notice of violation" dated June 2, 1997, which states that on April 23, 1997, "subject was terminated from the program by unanimous vote of the Unit Team as an inappropriate candidate when he denied the inappropriateness of his actions, regarding them as neither illegal nor harmful." Morrow appealed the decision through institution channels, which included a review by cell hall director John Thomas. Thomas, after reviewing the file, produced a memo dated May 6, 1997, which stated in part:

> Occasionally staff have accepted inmates into the program who are appealing their current conviction if the inmate had a prior conviction in which he displayed behavior similar to that described in the appealed conviction. Because the behaviors are the same the inmate can discuss them and make progress in therapy without jeopardizing his appeal.

> These dynamics aren't true in your case. In past offenses you've been sexually inappropriate with young females. In your current offense your victim was a young male. This is a significant escalation of deviant behavior that staff believe needs to be addressed. Unfortunately, because you are appealing your conviction, you can't talk about that behavior in therapy.

In an affidavit dated January 1998, Thomas stated that before responding to Morrow's administrative appeal notice, he reviewed Morrow's file, spoke with Morrow's treatment therapist, and also spoke with Morrow.[3] Based on his review of the matter, Thomas determined that Morrow had been properly terminated from the program because he was unamenable to treatment. Thomas' affidavit stated that "[m]y review indicated that Morrow was in denial about his offense and that he was unwilling to discuss all of the facts of his offense because he was appealing his conviction." Morrow told Thomas that he thought he should be allowed to remain in the program because he was willing to talk about his prior convictions involving criminal sexual conduct with young females.[4] Thom-

---

programming within the prison system or if the offender refuses or fails to comply with the program's requirements." Minn.Stat. § 241.67, subd. 3(a).

3. In his affidavit, Thomas states that he has a master's degree in guidance counseling and has been employed by the department of corrections since 1971 as a correctional officer, a case manager, a sex offender therapist, a work release agent, and at the time relevant to this case, as a corrections program director.

4. Morrow makes much of the fact that he expressed willingness to participate. That might be relevant if Morrow had been terminated after he "refus[ed] or fail[ed]" to comply with the program's requirements." Minn.Stat. § 241.67, subd. 3. Unamenability is set forth as a separate

as' affidavit addressed this issue, stating: "At that time I made it clear to [Morrow] that his refusal to discuss his current offense would be a significant obstacle to successful treatment." Thomas went on to say in his affidavit:

Because Morrow was unwilling to discuss or accept responsibility for his current offense, it did not appear that he could benefit from the treatment program or that treatment staff could address successfully the behavioral problems underlying his conviction. Under such circumstances it was appropriate to discharge Morrow from the program. * * *

I referenced Morrow's pending appeal in my memorandum [of May 6, 1997] because this seemed to be a significant factor in Morrow's refusal to discuss or accept responsibility for his offense. I did not intend to convey the impression that Morrow was terminated from the program simply because he had appealed his conviction. As I indicated at the conclusion of my memorandum, the fact that Morrow was appealing his conviction was relevant to the extent it meant he was unwilling to discuss his current offense in a meaningful way.

Morrow offered an additional justification for his continued denial of the sexual contacts, which was that he had testified at his trial in his own defense and was concerned that cooperation with treatment would result in a perjury prosecution.[5]

The department originally calculated Morrow's supervised release date to be January 22, 1998. The department also advised Morrow that failure to comply with the treatment requirement would result in Disciplinary Confinement Time Added (DCTA), which would delay his supervised release date. Following the program team's determination that Morrow was unamenable to treatment, a disciplinary hearing was held on September 30, 1997. The hearing officer found Morrow guilty of the charge and assessed a disciplinary sanction of 90 days DCTA. After the imposition of DCTA, the department calculated Morrow's new supervised release date to be April 22, 1998. Morrow appealed the decision to the warden who affirmed the hearing officer.[6]

On appeal to this court, Morrow challenges the constitutionality of the Commissioner's actions.[7] The parties do not dispute the facts and thus we are faced with questions of law subject to *de novo* review. *See Metropolitan Property & Cas. Ins. Co. v. Metropolitan Transit Comm'n*, 538 N.W.2d 692, 695 (Minn.1995); *see also Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn.1989) (stating that where the only questions before the court are questions of law, "no deference need be given to the decisions below").

As a preliminary matter, we note that Morrow is not challenging the Commissioner's decision—made by the treatment team and affirmed by the warden—that he is una-

and independent reason for discharge from sex offender treatment. *See id.*

5. The dissent writes that "[t]he fact that an individual is a bad person should not compel a different result." We agree, and only add that nowhere in the opinion except the dissent is Morrow characterized as a "bad person." Furthermore, any facts included in the opinion are from a record that Morrow has characterized as undisputed.

6. Following the court of appeals' decision in this case, the Commissioner of Corrections and Morrow entered into a stipulation releasing Morrow from incarceration. Morrow acknowledged in the stipulation that in the event the court of appeals' decision was reversed, the Commissioner may require Morrow to serve the remaining portion of his 90–day DCTA.

7. Morrow did not include his Fifth Amendment self-incrimination claim in his written memoran-

dum to the trial court; the parties indicated that Morrow addressed the issue orally before the trial court. The court of appeals summarily concluded that Morrow had not waived his right to present the claim. *See State ex rel. Morrow v. LaFleur*, 577 N.W.2d 226, 227 (Minn.App.1998). The general rule is that issues not raised in the trial court, even constitutional issues, will not be considered on appeal. *See State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989); *see also Thayer v. American Financial Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn.1982) (reviewing court will consider "only those issues that the record shows were presented and considered by the trial court in deciding the matter before it"). Because this appeal presents undisputed facts and because the parties briefed the issue to both this court and the court of appeals, we will consider the issue in the interests of justice. *See* Minn. R. Civ.App. P. 103.04.

menable to treatment. Morrow's brief does not address the underlying facts regarding this factual determination and the sparse record before us contains no evidence that would lead us to question the determination. We are mindful of the deference accorded to agency actions. "[D]eference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). With this in mind, we will address in turn Morrow's claim that the Commissioner violated his Fifth Amendment privilege against self-incrimination and his substantive due process rights.

## I. Fifth Amendment privilege

Morrow claims that the Commissioner retaliated against him for invoking his Fifth Amendment privilege against self-incrimination. The issue before us is whether the Fifth Amendment privilege against self-incrimination prohibits the Department of Corrections from making a finding of unamenability to treatment when that finding is based in whole or in part on the inmate's assertion that truthful cooperation with treatment could subject him to criminal liability.

■ The Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. *See also* Minn. Const. art. 1, § 7. The Fifth Amendment " 'privileges [the individual] not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)); *see also Parker v. Hennepin County Dist. Ct., Fourth Judicial Dist.*, 285 N.W.2d 81, 82 (Minn.1979) (stating that the Fifth Amendment right against self-incrimination may be invoked in civil cases).

■ Morrow argues that the Commissioner attempted to compel the disclosure of incriminating statements by threatening, and later imposing, disciplinary action against him. Compulsion is the "touchstone of the Fifth Amendment." *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *see also South Dakota v. Neville*, 459 U.S. 553, 562, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (citing *Fisher v. United States*, 425 U.S. 391, 397, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (stating that "[t]he Court has held repeatedly that the Fifth Amendment is limited to prohibiting the use of 'physical or moral compulsion' exerted on the person asserting the privilege")). However, not every burden on the exercise of a constitutional right and not every encouragement to waive such a right is invalid. *Corbitt v. New Jersey*, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978). Therefore, we first turn our attention to the nature of the alleged penalty for refusing to admit the offense of conviction.[8] We focus on the nature of the claimed compulsion and conclude that Morrow had a choice between treatment and confinement for a larger portion of his sentence, and that the "choice does not rise to the level of compulsion necessary in order to constitute a Fifth Amendment violation." *Heddan v. Dirkswager*, 336 N.W.2d 54, 65 (Minn.1983).

■ The nature of the claimed compulsion here is the choice between fully participating in mandated sex offender treatment, which includes in this case admission of the conduct for which appellant was convicted, or facing disciplinary action for failure to complete treatment, which delays the date of the inmate's supervised release. Two federal circuits have determined that requiring a convicted sex offender to admit to his crime in order to enter a prison treatment program does not violate the Fifth Amendment privilege against self-incrimination. *See McMorrow v. Little*, 109 F.3d 432 (8th Cir.1997); *Johnson v. Baker*, 108 F.3d 10 (2d Cir.1997); *Asherman v. Meachum*, 957 F.2d 978 (2d Cir.1992) (en banc).[9] We agree, and hold

---

**8.** The lower courts were perhaps generous in characterizing Morrow's statements as an invocation of his Fifth Amendment rights. We have never held the Fifth Amendment is invoked by maintaining that one's actions were proper and

harmless. Still, this point is not necessary to our disposition of this case.

**9.** *See infra* footnote 13 (discussing these cases).

that the Fifth Amendment does not require that an inmate who will not discuss the facts underlying his conviction as part of mandated sex offender treatment—for whatever reason, including the assertion of his Fifth Amendment privilege against self-incrimination—is entitled to early supervised release on the same schedule as those inmates who fully participate in treatment.

There is an important distinction to be drawn between being released from prison earlier than the time ordered in one's sentence and losing one's freedom when one is not serving a sentence. *See Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex,* 442 U.S. 1, 9, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (stating "[t]here is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires").[10] Minnesota's statutory scheme expressly provides that a prisoner does not have a right to a "specific, minimum length of a supervised release term." Minn.Stat. § 244.101, subd. 3. A prisoner's supervised release date is conditional on compliance with prison rules, *including* participation in "treatment or other rehabilitative programs." Minn.Stat. §§ 244.101, subd. 1, 244.05, subd. 1b(b). In the plainest of terms, when Morrow received a 36–month sentence, those 36 months belonged presumptively to the state. Reducing the part of the 36–month sentence that is to be spent on supervised release is not a penalty of such magnitude that it is comparable to those detailed in the Supreme Court's so-called "penalty" cases. *See, e.g., Cunningham,* 431 U.S. at 801, 97 S.Ct. 2132; *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).[11] The Third Circuit

aptly summarized the Supreme Court decisions:

> [T]he Court has held that loss of a job, loss of state contracts, loss of future contracting privileges with the state, loss of political office, loss of the right to run for public office in the future, and revocation of probation are all "penalties" that cannot be imposed on the exercise of the privilege. These cases "establish[ ] that a state may not impose substantial penalties because a witness elects to exercise his Fifth Amendment privilege not to give incriminating testimony against himself."

*United States v. Frierson,* 945 F.2d 650, 658 (3d Cir.1991) (citing *Cunningham,* 431 U.S. at 805, 97 S.Ct. 2132), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992). Thus we conclude that the loss of an opportunity for an earlier supervised release date does not constitute a substantial penalty for purposes of the Fifth Amendment.

 Even though disciplinary time added does not constitute a substantial penalty for Fifth Amendment purposes, we caution that, as the district court observed in this case, prison officials cannot impose disciplinary sanctions against an inmate "in retaliation for the [inmate's] exercise of his constitutional rights." *Goff v. Burton,* 7 F.3d 734, 738 (8th Cir.1993), *cert. denied,* 512 U.S. 1209, 114 S.Ct. 2684, 129 L.Ed.2d 817 (1994). We agree with Morrow that, as a threshold matter, any discipline for refusing to answer questions must be based on legitimate official inquiry. The purpose cannot be simply to give prison officials a "sense of satisfaction." *See State v. Carrizales,* 191 Wis.2d 85, 528 N.W.2d 29, 32 (Ct.App.1995) (an admission is "a first step toward rehabilitation" and is not required simply to give prison officials "a sense of satisfaction.").

---

**10.** The dissent mischaracterizes the import of *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex* in our Fifth Amendment privilege analysis. We agree with the dissent that the absence of a substantive due process violation does not necessarily mean that the sanction is not a compulsion that violates the Fifth Amendment. We rely on *Greenholtz* simply to note the difference between a recognized liberty interest and a conditional liberty interest. Our legislature has reached the same conclusion, determining that prisoners do not have a right to

early release and that they must follow prison regulations. *See* Minn.Stat. § 244.101, subds. 2–3 (1998). Other courts have reached a similar conclusion. *See, e.g., Russell v. Eaves,* 722 F.Supp. 558, 559–60 (E.D.Mo.1989) (stating, as "threshold matter," in case dismissing Fifth Amendment claim similar to Morrow's as "legally frivolous," that neither Missouri's parole statute nor Missouri's parole board regulations create a protected liberty interest in parole).

**11.** *See infra* footnote 13 (discussing these cases).

The Commissioner contends that questions about the crime of conviction are relevant to treatment of the offender. The district court had before it the affidavit of Jim Berg, which stated that it is well accepted in the treatment community that demonstrated willingness to discuss and accept responsibility for offenses is "critical to the successful treatment of recidivistic sex offenders." Morrow does not specifically deny this, and there is ample support in the case law from other jurisdictions for the proposition that it is generally accepted. *See, e.g., Baker,* 108 F.3d at 12 ("An inmate who is unwilling to admit to particular criminal activity is unlikely to benefit from a rehabilitative process aimed at helping those guilty of that activity.").

We take particular issue with the court of appeals' assertion in this case that what Morrow *was* willing to admit provided ample grist for therapeutic discussion. The issue is not whether Morrow and a counselor could have found something to talk about, or even, given the luxury of time and healing, whether Morrow would ultimately have come to admit that what he did was harmful. Treatment of sex offenders is a legitimate penological interest. Sex offender treatment professionals, charged with the responsibility of determining amenability to treatment, are not required to just "do the best they can" with whatever the inmate chooses to tell them. The court of appeals, in concluding that some treatment is possible, has improperly substituted its judgment for that of the treatment professionals. We are not in the business of sex offender treatment and leave such decisions to those who are, absent a showing that the Department of Corrections' actions were unreasonable, arbitrary, or capricious. *See Carl Bolander & Sons Co. v. City of Minneapolis,* 502 N.W.2d 203, 207 (Minn.1993). Morrow has not attempted, much less made, such a showing.

Here, the Commissioner required Morrow to respond to relevant official inquiries. *See* Minn.Stat. § 241.67, subd. 3 (requiring the Commissioner to establish programs to rehabilite sex offenders while imprisoned); Minn. Stat. § 244.05, subd. 1b (providing authority for the imposition of disciplinary confinement time). The Commissioner did not seek a court order compelling answers to the inquiries, require a waiver of immunity, or insist that the answers be used in a criminal proceeding. *See Baker,* 108 F.3d at 12. Thus, we conclude that the imposition of DCTA was a reasonable consequence of Morrow's failure to participate in the treatment program, and he was not punished solely because he refused to waive his Fifth Amendment privilege.

Morrow also argues that there is no distinction between punishment for invocation of a constitutional right and punishment for refusing to answer relevant official inquiries. This is the position taken by the dissenting judge in *Asherman,* who argued that the majority's distinction "mischaracterizes Fifth Amendment jurisprudence" because the prisoner was punished for invoking the privilege. *Asherman,* 957 F.2d at 986–88 (Cardamone, J., dissenting). The court of appeals agreed that Morrow was "being punished immediately and directly for his failure to (fully) admit guilt," and that "this [punishment] violates due process and Morrow's Fifth Amendment privilege." [12] *Morrow,* 577 N.W.2d at 228. However, such a distinction is well established, and is recognized by the Supreme Court.[13]

---

12. The court of appeals also distinguished this case from its decision in *Taylor v. Lieffort,* 568 N.W.2d 456 (Minn.App.1997). In *Taylor,* on similar facts, the court held that an inmate's right against self-incrimination was not violated by a requirement that he admit guilt as a condition of voluntary entry to a sex-offender treatment program. *Id.* at 458. The court of appeals refused to apply *Taylor* in Morrow's case because Morrow had not exhausted his direct appeal at the time he was directed to complete the treatment program, and the court of appeals concluded that the treatment staff in Morrow's case punished him for not admitting guilt rather than considering it as one factor in determining Morrow's amenability to treatment, and Morrow had agreed to participate in the program. *Morrow,* 577 N.W.2d at 228. In doing so, the court of appeals ignored the authority upon which it had relied in *Taylor. Taylor,* 568 N.W.2d at 458 (citing *Henderson v. State,* 543 So.2d 344 (Fla. Dist.Ct.App.1989), *pet. for rev. denied,* 551 So.2d 461 (Fla., Sept.18, 1989)).

13. In *McMorrow v. Little,* a prisoner brought a civil rights claim pursuant to 42 U.S.C. § 1983, alleging that prison officials withheld parole, work release, and less restrictive confinement because he refused to admit to his crime in order to enter a sex offender treatment program. 109 F.3d 432 (8th Cir.1997). The Eighth Circuit held that the prison officials' qualified immunity

Moreover, the refusal by the court of appeals to recognize the distinction is not consistent with our precedent. In *In re Welfare of J.W. and A.W.*, 415 N.W.2d 879 (Minn. 1987), we acknowledged the distinction between punishment of individuals for invocation of their Fifth Amendment privilege and punishment for refusal to answer relevant inquiries. *Id.* at 882–83. *See also In re Matter of J.G.W. and J.L.W.*, 433 N.W.2d 885, 886 (Minn.1989). In *J.W.*, the parents of two neglected children challenged a trial court's imposition of a rehabilitation plan that required them to explain the death of their 2–year–old nephew who died while in their care. *J.W.*, 415 N.W.2d at 880–81. We held that the trial court's order, to the extent it required the parents to incriminate themselves, violated their Fifth Amendment rights. *Id.* at 883. However, we explained that the state may require the parents to

undergo therapy, and we concluded that therapy without an admission of wrongdoing may be ineffective and, thus, impair the parents' chances of regaining their children. *Id.* We reasoned that such "consequences lie outside the protective ambit of the Fifth Amendment." *Id.*

The same reasoning applies here. We agree that the state may not directly compel Morrow to admit his crime, but the state may require Morrow to undergo treatment. Morrow may have to admit some inappropriate sexual contact with a young boy or boys in order to participate in treatment and could face discipline for failure to complete the program. Morrow requests that the Commissioner be ordered to provide him with treatment even if he refuses to admit to his offense and refuses to acknowledge doing anything that was inappropriate, illegal, or harmful.[14] The legitimacy of prison sex offender treatment derives from soci-

barred relief because the prisoner did not establish that the officials violated a constitutional right that was clearly established at the time of the conduct. *Id.* at 436. In so holding, the court explained that prison officials may sanction a prisoner as long as the sanction is "based on the prisoner's refusal to participate in his rehabilitation and not his invocation of his privilege." *Id.* at 436 (citing *Asherman v. Meachum*, 957 F.2d 978, 980–81 (2d Cir.1992) (*en banc*)).

In *Asherman*, the Second Circuit, sitting en banc, determined that termination of the petitioner's supervised home release status did not violate his privilege against self-incrimination. 957 F.2d at 980. The Second Circuit explained that state officials are permitted to take adverse administrative action for failure to respond to legitimate inquiries, even when the answers might tend to incriminate, so long as the adverse consequence is not imposed for refusal to give up a constitutional right. For example, the state may not seek a court order compelling answers to inquiries, require a waiver of immunity, or insist that the answers be used in a criminal proceeding. *Id.* at 983. *See also Johnson v. Baker*, 108 F.3d 10, 11–12 (2d Cir.1997) (relying on *Asherman* to hold that prison officials did not violate a prisoner's Fifth Amendment rights by requiring that he admit his offenses as a prerequisite to admission in a sex offender treatment program).

In resolving the issue before it in *Asherman*, the Second Circuit was guided by the United States Supreme Court's "penalty" cases. *See Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). In *Sanitation Men*, 15 sanitation workers were brought before a committee investigating corruption. All 15 were discharged for refusing to sign

a waiver of immunity or refusing to answer questions based on their Fifth Amendment privilege. 392 U.S. at 282–83, 88 S.Ct. 1917. In *Gardner*, a police officer was discharged for his refusal to sign a waiver of immunity. 392 U.S. at 274–75, 88 S.Ct. 1913. In both cases, the Supreme Court held that the discharges were unconstitutional because the public employees were discharged, "not for failure to answer relevant questions about [their] official duties, but for [their] refusal to waive a constitutional right." *Gardner*, 392 U.S. at 278, 88 S.Ct. 1913; *Sanitation Men*, 392 U.S. at 283, 88 S.Ct. 1917 ("Petitioners were not discharged merely for refusal to account for their conduct as employees of the city. They were dismissed for invoking and refusing to waive their constitutional right against self-incrimination."); *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) ("Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity") (citing *Gardner*, 392 U.S. at 278–79, 88 S.Ct. 1913).

14. Other courts have concluded that requiring a prisoner to admit guilt as a precondition to sex offender treatment does not meet the compulsion element of the Fifth Amendment because the prisoner has a choice between treatment and continued confinement. *See Russell v. Eaves*, 722 F.Supp. 558, 560 (E.D.Mo.1989); *White v. People*, 866 P.2d 1371, 1374 n. 3 (Colo.1994); *Henderson v. State*, 543 So.2d 344, 346 (Fla.Dist. Ct.App.1989), *pet. for rev. denied*, 551 So.2d 461 (Fla. Sept.18, 1989); *Knowles v. Warden*, 140 N.H. 387, 666 A.2d 972, 977 (1995); *Weaver v. Pennsylvania Bd. of Probation & Parole*, 688 A.2d 766, 778–79 (Pa.Cmwlth.Ct.1997); *see also United States v. Ross*, 9 F.3d 1182, 1191 (7th Cir.

ety's interest in returning sex offenders to the public in a treated state. Therefore, the legitimate penological interest may be served by requiring a prisoner to comport with the accepted norms of effective treatment.[15]

We therefore conclude that Morrow was not compelled to surrender his Fifth Amendment privilege, and we reverse the court of appeals.

## II. Substantive due process claim

We now turn to Morrow's claim that the Commissioner violated his right to substantive due process by forcing him to admit his offense. If a fundamental right is at stake, the state action is subject to strict scrutiny and the state must show "a legitimate and compelling interest" for abridging that right. *See In re Blodgett,* 510 N.W.2d 910, 914 (Minn.), *cert. denied,* 513 U.S. 849, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994). For any other interest, "judicial scrutiny of the substance of state legislation under the due process clause is not exacting." *State v. Behl,* 564 N.W.2d 560, 567 (Minn.1997) (citing *Bowers v. Hardwick,* 478 U.S. 186, 191–96, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986)). Under this less exacting standard, "substantive due process requires only that the legislative enactments not be arbitrary or capricious or, stated another way, that they be a reasonable means to a permissive object." *Id.* (explaining the rational basis standard of review).

Morrow asserts that the fundamental interest at stake in this case is "the ability to control one's own thoughts" because the Commissioner, in essence, required him to admit guilt in order to enter the treatment program. The court of appeals, without stating the fundamental right at stake, held that disciplining a prisoner by terminating him from a treatment program that is based solely on the prisoner's refusal to admit the legal

elements of his offense while his conviction is on appeal violates his due process rights. *See Morrow,* 577 N.W.2d at 228.

We disagree with the court of appeals. We first note that Morrow does not have a fundamental right to refuse treatment. *See Sundby v. Fiedler,* 827 F.Supp. 580, 583 (W.D.Wis.1993) (citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Second, Morrow does not have a fundamental right to receive treatment. *See Stewart v. Davies,* 954 F.2d 515, 516 (8th Cir.1992) (inmate has no constitutional right to rehabilitative programming). And third, Morrow does not have a fundamental right to be released from prison before the expiration of his lawfully imposed sentence. *See Greenholtz,* 442 U.S. at 9, 99 S.Ct. 2100.

Morrow has not shown that the Commissioner violated a fundamental interest by imposing disciplinary time for his failure to complete a sex offender treatment program. A disciplinary sanction is rationally related to the societal interest in ensuring that sex offenders do not commit new offenses when released from prison. *See Grenemyer v. Gunter,* 770 F.Supp. 1432, 1438 (D.Colo.1991), *aff'd,* 968 F.2d 20 (10th Cir. 1992); *Nicolaison v. Erickson,* 425 N.W.2d 597, 599 (Minn.App.1988) (rehabilitation of sex offenders serves a legitimate penological interest). We conclude the Commissioner did not violate Morrow's substantive due process rights; therefore, we reverse the court of appeals.

Reversed.

PAGE, Justice (dissenting).

I respectfully dissent. The DOC's policy of imposing DCTA for an inmate's failure to complete a sex offender treatment program because of the inmate's refusal to answer official inquiries about his offense during a pending appeal of his conviction violates that

1993), *vacated on other grounds,* 511 U.S. 1124, 114 S.Ct. 2129, 128 L.Ed.2d 860 (1994) (concluding that a prisoner convicted of illegal possession of an unregistered firearm and explosives had to choose between complying with lawfully imposed conditions of probation or having his probation revoked).

15. While the dissent contends that a grant of immunity for admissions made during sex of-

fender treatment would protect Morrow's rights, the issue of whether such a statement is admissible in a subsequent proceeding or whether it could form the basis of a perjury prosecution is not necessary to the resolution of this case. The issue was not briefed by the parties and only addressed at oral argument. Therefore, we decline to address the issue here.

inmate's Fifth Amendment privilege against self-incrimination.

The Fifth Amendment provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." [1] The privilege allows an individual to refuse to answer official questions put to him in any civil or criminal proceeding if the answers might incriminate him in future criminal proceedings. [2] When an individual asserts the privilege, "he 'may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him' in a subsequent criminal proceeding." [3] The fact that the individual is considered to be a bad person should not compel a different result.

Upon entry into the sex offender treatment program at MCF–Lino Lakes, the DOC required Morrow to admit that the conduct resulting in his conviction was "inappropriate, illegal, or harmful" in order to continue with the program. While the DOC required Morrow to admit his conduct, it did not assure him that any admissions he made would not be used against him in any subsequent criminal proceeding. Rather than make any admissions, Morrow asserted his Fifth Amendment privilege against compelled self-incrimination because his conviction was on appeal. From the record it is clear that Morrow's invocation of his Fifth Amendment privilege was the sole basis for his termination from the program. It is also clear that the only reason he was unwilling to discuss or accept responsibility for his offense was because his appeal was pending. Consequently, it cannot seriously be argued that the imposition of 90 days DCTA resulted from something other than the invocation of his constitutional right.

By its decision in this case, the court now holds that an inmate's Fifth Amendment privilege is not implicated by being required to answer official inquiries when the state does not seek an order to compel answers to an inquiry, require a waiver of immunity, or threaten the inmate with use of the statements in a future criminal proceeding. [4] The distinction the court makes between these last three forms of compulsion and "merely" requiring a response to an official inquiry is lost on me. Making such a distinction is an exercise in semantics and exalts form over substance. Here, the state conceded that, if Morrow had made incriminating statements during the treatment program and subsequently obtained a new trial, it might attempt to use those incriminating statements against him at the new trial. Whether compelled by a court order, a requirement to waive immunity, a threat to use Morrow's statements against him, or the addition of DCTA, the compulsion to speak is no different.

Moreover, the court contends that the mere compulsion to speak does not violate the Fifth Amendment because the state has a legitimate penological interest in treatment of sex offenders. The determination that the state has a legitimate interest should not end the inquiry because the state always has an interest in procuring a statement from the accused. [5] The fact that the state may have a

---

1. U.S. Const. amend. V.

2. *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

3. *Id.* at 429, 104 S.Ct. 1136 (quoting *Maness v. Meyers*, 419 U.S. 449, 473, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975) (White, J., concurring in result)) (emphasis in original).

4. The Second Circuit in *Asherman v. Meachum*, 957 F.2d 978 (2d Cir.1992) (en banc), distinguished these three forms of compulsion from requiring an inmate to answer official inquiries to prevent revocation of his supervised home release status. *Id.* at 982. The court assumed that the inmate could not have been subjected to a court order directing him to answer questions upon pain of contempt for refusing to answer. *Id.* at 981. Further, the court determined that the inmate could not have been ordered to waive his self-incrimination privilege, *id.* (citing *Gardner v. Broderick*, 392 U.S. 273, 279, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968)), and that the "state may not take adverse action in response to an invocation of the privilege in response to questions not reasonably related to the exercise of state authority." *Id.* (citing *Slochower v. Bd. of Higher Educ.*, 350 U.S. 551, 558–59, 76 S.Ct. 637, 100 L.Ed. 692 (1956)).

5. *See, e.g., Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (discussing state's legitimate interest in "securing from public employees an accounting of their public trust"). In fact, the court fails to explain

legitimate interest in procuring a statement does not mean that the state can compel statements in violation of the Fifth Amendment. All that is required to find compulsion in violation of the Fifth Amendment is that the DOC "sought to induce [Morrow] to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' "[6]

Any contention that the imposition of DCTA is not a sanction capable of forcing self-incrimination is absurd. Although the 90 days DCTA did not alter Morrow's sentence, it did serve to lengthen the amount of time he actually had to spend in prison. Therefore, without an assurance that his statements would not be used against him, compelling Morrow to answer official inquiries violates his Fifth Amendment privilege.[7] The simple solution to this problem, as noted in *Welfare of J.W. and A.W.*,[8] is for the state to grant Morrow immunity for any incriminating statements made relating to the specific crime for which he was convicted and which was the subject of his appeal to the court of appeals.

The fundamental problem with the court's analysis is its use of substantive due process jurisprudence to prop up its conclusion that the imposition of DCTA does not violate Morrow's Fifth Amendment rights. The court focuses on whether Morrow has a right to early release and correctly concludes that he does not have a right to a specific supervised release date. However, the court's reliance on cases such as *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*[9] in the context of Fifth Amendment analysis is misplaced. The absence of a substantive due process violation does not necessarily mean that the sanction imposed is not a compulsion in violation of the Fifth Amendment. The inquiry should focus on whether the imposition of DCTA is a sanction "capable of forcing the self-incrimination which the

Amendment forbids." Assuming Morrow's sentence "belonged presumptively to the state," the additional 90 days DCTA is still a sanction capable of forcing self-incrimination. Thus, although Morrow is not entitled to a specific supervised release date, on the facts presented here I conclude that he was compelled to waive his privilege against self-incrimination in violation of the Fifth Amendment.

PAUL H. ANDERSON, Justice (dissenting).

I join in the dissent of Justice Page.

---

the difference between the state's legitimate interest in treatment in this case and, for example, the state's interest in rooting out corruption in *Cunningham,* or for that matter, the state's interest in determining whether the accused in a murder case committed the crime.

**6.** *Murphy,* 465 U.S. at 434, 104 S.Ct. 1136 (quoting *Cunningham,* 431 U.S. at 806, 97 S.Ct. 2132).

**7.** *See Asherman,* 957 F.2d at 989 (Cardamone, J., dissenting).

**8.** 415 N.W.2d 879, 884 (Minn.1987).

**9.** 442 U.S. 1, 9, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (discussing the "distinction between being deprived of a liberty one has * * * and being denied a conditional liberty that one desires").