David DONHAUSER, Plaintiff,

v.

Glenn S. GOORD, Commissioner of the New York State Department of Correctional Services; Martha E. Yourth, CSW Guidance Specialist; Dominic Martinelli, Sex Offender Program Counselor; and S. Carter, S.C.C., Oneida Correctional Facility, Defendants.

No. 01–CV–1535.

United States District Court, N.D. New York.

April 15, 2004.

David Donhauser, Oneida Correctional Facility, Rome, NY, Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General for the State of New York, Albany, NY, Nelson Sheingold, Assistant Attorney General, of Counsel.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

On April 23, 2002, *pro se* plaintiff David Donhauser ("plaintiff") filed a second amended complaint against defendants (Glenn S. Goord, Commissioner of the New York State Department of Corrections; Martha E. Yourth, CSW Guidance Specialist; Dominic Martinelli, Sex Offender Program Counselor; and S. Carter, S.C.C., Oneida Correctional Facility) pursuant to 42 U.S.C. § 1983, alleging various violations of his federal/constitutional rights. On July 17, 2002, defendants filed a motion to dismiss the second amended complaint pursuant to Fed.R.Civ.P. 12. (Docket No. 25.) By Report–Recommendation dated January 22, 2003, the Honorable Gary L. Sharpe, United States Magistrate Judge, now District Court Judge, recommended that the defendants' motion to dismiss be granted. (Docket No. 48.) Plaintiff has filed objections to the Report–Recommendation. (Docket No. 50.)[1]

## II. RULE 12(B)(6) STANDARD

■ In deciding a Rule 12(b)(6) motion, a court "must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint 'unless it appears beyond a reasonable doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.'" *Sheppard v. Beerman*, 18 F.3d 147,

150 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir.1995). It should be noted, however, that where a complaint is submitted *pro se*, "the allegations of such a complaint, 'however inartfully plead,' are held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). Thus, in cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint." *See Donahue v. United States Dep't of Justice*, 751 F.Supp. 45, 49 (S.D.N.Y.1990) (considering *pro se* plaintiff's papers filed in opposition to motion to dismiss); *see also Tsai v. Rockefeller Univ.*, 137 F.Supp.2d 276, 280 (S.D.N.Y.2001) (same); *Williams v. Koenigsmann*, No. 03 Civ 5267, available at 2004 WL 315279, at *1 n. 1 (S.D.N.Y. Feb. 18, 2004) (same); *Supinski v. Merrill Lynch & Co.*, No. 00CV7363, available at 2001 WL 930779, at *1 n. 2 (E.D.N.Y. Aug. 13, 2001) (same). Thus, in laying out the factual background of the case, for the purposes of deciding defendants' pending motion to dismiss, the factual allegations contained in plaintiff's complaint and opposition papers will be considered. (Docket Nos. 13, 44.)

## III. FACTUAL BACKGROUND

Taken in the light most favorable to plaintiff, the non-moving party, the following are the facts.

Plaintiff, at all relevant times, was incarcerated at Oneida Correctional Facility

---

**1.** Also pending is a motion for preliminary injunctive relief filed by plaintiff. (Docket No. 54.) That motion will be decided in a separate order, in light of the disposition of defendants' motion to dismiss.

("OCF"). On April 20, 2000, plaintiff's counselor at OCF referred him to the Sex Offender Counseling Program ("SOCP"). (Docket No. 13, ¶ 9.) Successful completion of the SOCP requires, among other things, the participant to accept responsibility for the sexually offending behavior that resulted in his or her incarceration, and to divulge any history of sexually offending behavior, including acts or conduct for which the participant was not or has not been criminally charged. Accordingly, "[a]ny offender who wishes to participate in the [SOCP] must sign a Waiver of Partial Confidentiality." (Docket No. 44, App.)

According to the SOCP policy and procedure manual, if an inmate elects to participate and disclose the information outlined above, program counselors "are required to report evidence of child physical and/or sexual abuse that has occurred or is planned and any specific details of previous crimes for which the offender has not been charged." *Id.* The manual further notes that "an inmate who discloses the details of any prior crime(s), must be reported to the appropriate authorities so that society will be protected." *Id.*

Plaintiff informed the counselor that he was not guilty of any sex crime, including the one prompting his current incarceration, and that he did not wish to divulge any past information that could prompt further criminal charges. Plaintiff also informed the counselor that he was incarcerated as a result of a plea pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), under which plaintiff did not have to admit guilt. Accordingly, plaintiff informed the coun-

selor he would not enter the SOCP. (Docket No. 13, ¶ 9.) According to the SOCP policy and procedure manual, inmates who refuse to participate in the program "should be made aware of the negative impact his/her decision may have on .... Time Allowance Committee decisions." (Docket No. 44, App.)

Though defendants assert that plaintiff has not alleged any causal connection between the refusal to divulge a sexual history and the loss of good time credits one would suffer as a result thereof, a cursory scan of the allegations reveals that this is not true. Plaintiff alleges that "[o]n April 20, 2000, his counselor advised [him] in writing that his refusal *will* result in loss of good time [credits]." (Docket No. 13, ¶ 10) (emphasis added). Plaintiff claims that he thereafter wrote several letters to OCF administrators explaining the situation as he perceived it. On November 9, 2000, he claims to have received a letter from defendant Yourth, who informed him "that his failure to participate in the [SOCP] *will* result in [a] negative impact on his earning good time." *Id.* at ¶ 12 (emphasis added). On February 14, 2001, plaintiff alleges to have written defendant Carter, stating his desire to participate in the program if were allowed to not admit his guilt to the crime for which he was incarcerated, and divulge a sexual history, including acts for which no criminal charges had yet been brought. *Id.* at ¶ 13. On March 20, 2001, plaintiff alleges to have written a Department of Corrections' attorney regarding his situation. He claims to have been informed by this attorney "that he *must* participate in the SO[C]P or lose his good time and other privileges." *Id.* at ¶ 14 (emphasis added).[2]

---

2. Plaintiff has submitted more concrete evidence of the causal connection between the refusal to participate in the SOCP and the loss of good time credits that would occasion such a refusal. Specifically, attached to his proposed third amended complaint was an ap-

parently internal Department of Corrections' memorandum in which it was stated that "Sr. Correction Counselor Yourth," who is a defendant in this case, has, together with "Deputy Commissioner R. Broddus[,] ... directed

On April 23, 2002, plaintiff filed a second amended complaint, asserting causes of action pursuant to 42 U.S.C. § 1983.[3] In the complaint, plaintiff contends that the program, by requiring him to divulge a history of sexual conduct, including illegal acts for which no criminal charges had been brought, or else face a loss of good time credits, violated his Fifth Amendment privilege against self-incrimination. The remainder of the causes of action asserted by plaintiff in the second amended complaint are unclear, but it appears he is alleging that his privacy, equal protection, and due process rights were all violated.

As relief, plaintiff seeks, *inter alia:* (1) a declaratory judgment that the SOCP, with its requirement that participants divulge sexual histories, including sex acts for which no criminal charges have been brought, violates his Fifth Amendment privilege against self-incrimination; (2) injunctive relief barring defendants from continuing the SOCP in its present form, with such requirement; (3) compensatory damages in the amount of $1.5 million; and (4) punitive damages in the amount of $5 million. (Docket No. 13, Relief Requested, ¶ 2; Injunctive Relief, Part (B); Damage Relief, ¶¶ 1–2.)

## IV. MAGISTRATE JUDGE'S REPORT–RECOMMENDATION

On January 22, 2003, a written report was issued recommending that plaintiff's complaint be dismissed in its entirety for failure to state a claim upon which relief could be granted. (Docket No. 48.) With respect to plaintiff's Fifth Amendment claim, it was found that plaintiff had not suffered any adverse action as a result of his failure to participate in the SOCP, and that defendants had taken no actions to compel plaintiff to incriminate himself. It was also found that plaintiff's remaining claims—involving due process, equal protection, and the right to privacy—were without merit. It was found that the complaint, even liberally construed, failed to state a claim upon which relief could be granted.

On March 3, 2003, plaintiff filed objections to the Report–Recommendation. (Docket No. 50.)

that all good time is to be taken whenever it can be documented that an inmate refused to participate in recommended Sex Offender Programs." (Docket No. 71, attached.) However, because plaintiff's motion for leave to file a third amended complaint was denied, his motion to attach that document to the third amended complaint was moot. Plaintiff has not made any motion to attach said document to the second amended complaint, the subject of defendants' motion to dismiss. Nevertheless, as plaintiff adequately alleges that his good time credits were threatened as a direct and automatic result of his invocation of his privilege against self-incrimination and failure to participate in the SOCP, it would appear that no such motion need be made at this time.

3. After filing the second amended complaint, plaintiff's good time credits were withheld by the prison's Time Allowance Committee, which decision was affirmed at the highest levels of the administrative process. Plaintiff sought to add this allegation in a proposed third amended complaint. However, such an allegation would have been largely irrelevant to plaintiff's claim that the SOCP, with its requirement that participants divulge incriminating statements or else face a loss of good time credits, violates his Fifth Amendment privilege against self-incrimination, the only claim substantively discussed herein. Such an allegation would have instead been relevant to plaintiff's claim that he was deprived of a constitutionally protected interest when his good time credits were disallowed, in violation of his due process rights. Plaintiff's motion to file a proposed third amended complaint was denied on the grounds that, even with such an allegation, plaintiff failed to set forth a cognizable due process claim. Therefore, the fact that plaintiff has now actually suffered a loss of good time credits has no negative impact on his ability to bring a Fifth Amendment claim pursuant to 42 U.S.C. § 1983.

## V. DISCUSSION

Agreement is expressed with the *conclusion* that plaintiff's causes of action involving the violation of the rights to privacy, due process, and equal protection cannot be proven on the pleadings and must be dismissed. Agreement is also expressed with the *opinion* that plaintiff's Fifth Amendment claim, insofar far as it relates to the denial of his parole, must be dismissed.[4] The recommendation of dismissal as to plaintiff's Fifth Amendment claim, insofar as it relates to the automatic loss of good time credits an SOCP participant would suffer as a result of a refusal to participate in the program, however, is rejected.

There is no dispute that the SOCP requires participants to admit their guilt to the crime for which they are incarcerated, and to divulge a history of sexual conduct, including acts for which no criminal charges have been brought. Plaintiff claims that this requirement, and the consequences he was claimed to have been told would directly and automatically follow a refusal to comply with the same, violated his Fifth Amendment privilege against self-incrimination.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AM. V. The Supreme Court has expanded on this language, holding that "[t]he Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). The overall inquiry in this case— whether "the alterations in the [SOCP] were so great as to constitute compulsion for the purposes of the Fifth Amendment privilege against self-incrimination," *McKune v. Lile*, 536 U.S. 24, 49–50, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002), 536 U.S. at 49–50, 122 S.Ct. 2017 (O'Connor, J., concurring); *United States v. Jones*, 299 F.3d 103, 110 (2d Cir.2002) ("The Supreme Court has identified the key inquiry in determining whether a violation of the right against compelled self-incrimination has occurred 'as whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer'") (quoting *Garrity v. New Jersey*, 385 U.S. 493, 496, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967))—is not in dispute. The legal standard defining the contours of that ultimate question, however, is unclear.

### A. Preclusive Effect of McKune and Johnson

In the Report–Recommendation, it was found that the Supreme Court's plurality opinion in *McKune* "addressed this very issue." (Docket No. 48, p. 4.)[5] Because it

---

**4.** As was noted in the Report–Recommendation, because it is undisputed that many factors inform the decision of whether to grant or deny an inmate parole, and because it is not sufficiently alleged that plaintiff's refusal to participate in the SOCP, in and of itself, directly and automatically resulted in parole being denied, that portion of his Fifth Amendment claim must be dismissed.

**5.** In a prior order denying plaintiff's motion for preliminary injunctive relief, *McKune* was also cited as direct support for the holding that "[plaintiff's] claim that defendants may transfer [him] or take away privileges as a result of his failure to participate in the [SOCP] does not establish irreparable harm." (Docket No. 45.) To the extent such prior order can be interpreted to foreclose plaintiff's Fifth Amendment claim as it relates to a loss of good time credits, it is here clarified to not so foreclose such a claim, *see infra*. To the extent such prior order can be interpreted to foreclose any Fifth Amendment claim based on a transfer or the loss of any prison privileges, it is reaffirmed.

is not clear whether *McKune* was embraced as factually on point, or as providing the controlling legal standard, both will be addressed. While the Court in *McKune* was indeed confronted with a Fifth Amendment challenge to a sexual offender treatment program, and the consequences flowing from a refusal to participate therein, the prisoner in that case faced only the threat of a loss of privileges and a transfer to another facility as a result of his non-participation. Here, plaintiff is alleging he was faced with the threat of a loss of good time credits based on his refusal to participate in the SOCP, a distinction even the plurality in *McKune* found to be important when conducting its analysis:

> In the present case, respondent's decision did not extend his term of incarceration. Nor did his decision affect his eligibility for good-time credits or parole. Respondent instead complains that if he remains silent about his past crimes, he will be transferred from the medium-security unit—where the program is conducted—to a less desirable maximum-security unit.

*McKune*, 536 U.S. at 38, 122 S.Ct. 2017 (Kennedy, J., plurality). Therefore, *McKune* was not factually on point with the instant case.

Likewise, *Johnson v. Baker*, 108 F.3d 10 (2d Cir.1997) (per curiam), also cited in the Report–Recommendation, is not factually consistent with the instant case and does not mandate dismissal of plaintiff's Fifth Amendment claim. In *Johnson*, a prisoner challenged a correctional facility's decision to deny him entrance into a program which would have permitted him to spend extensive periods of time with his family. 108 F.3d at 11. Entry into the program required the prisoner to admit his guilt to sexual offenses as part of a treatment program. *Id.* At the time of his refusal, the prisoner's appeal was still pending. *Id.* The prisoner refused to do so, and claimed

that the resulting denial of his entrance into the program violated, *inter alia,* his Fifth Amendment privilege against self-incrimination. *Id.*

The Second Circuit, reaffirming its earlier decision in *Asherman v. Meachum,* 957 F.2d 978 (2d Cir.1992), "held that state officials are permitted to take adverse administrative action for failure to respond to inquiries, even where the answers might tend to incriminate, so long as the adverse consequence is imposed for failure to answer a relevant inquiry and not for refusal to give up a constitutional right." *Johnson,* 108 F.3d at 11. Finding that the correctional officials had not taken any prohibited steps to elicit incriminating answers from the prisoner, and recognizing that an inmate unwilling to admit his guilt to offenses for which he was convicted was also unlikely to benefit from the rehabilitative process, the court found no Fifth Amendment violation. *Id.* at 11–12.

*Johnson,* however, falls within the factual gambit of the judgment in *McKune.* Justice O'Connor, despite disagreeing with the *McKune* plurality as to the proper legal standard to be employed, did agree that the facts presented—the threat of a transfer and losing certain privileges that did not affect the term of incarceration—did not amount to a finding of unconstitutional compulsion. Thus, a majority of the Court did agree that adverse consequences that do not affect the length of imprisonment, resulting from a prisoner's failure to participate in a sexual offender treatment program, are not sufficient to form the basis of a Fifth Amendment claim. In *Johnson,* the privilege at issue was the denial of admission to a family visitation program, which also did not affect the term of incarceration. Thus, *Johnson* is factually consistent with *McKune* (and falls within the binding effect of the

Court's judgment on the facts) and factually inconsistent with the instant case.[6]

### B. Legal Standard and Application

The plurality opinion in *McKune* also fails to set forth the controlling legal standard by which to adjudge prisoners' Fifth Amendment compulsion challenges to a sexual offender treatment program. According to the plurality, "[d]etermining what constitutes unconstitutional compulsion involves a question of judgment: Courts must decide whether the consequences of an inmate's choice to remain silent are closer to the physical torture against which the Constitution clearly protects or the *de minimis* harms against which it does not." *McKune*, 536 U.S. at 41, 122 S.Ct. 2017. To make this determination, the plurality borrowed language from *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), proclaiming that "[a] prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to ordinary incidents of prison life." *McKune*, 536 U.S. at 37–38, 122 S.Ct. 2017. This very language, or significant parts thereof, was quoted in the Report–Recommendation as representing the standard under which plaintiff's Fifth Amendment claim was to be evaluated.

 However, the plurality opinion garnered the support of only four Justices, one shy of a majority. Justice O'Connor wrote separately, concurring with the plurality only in the judgment. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)); *see also O'Dell v. Netherland*, 521 U.S. 151, 160, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). Justice O'Connor did not join the plurality's characterization of the legal standard to be employed when evaluating Fifth Amendment compulsion challenges by prisoners, instead agreeing with the dissent that the standard is less restrictive than the "atypical and significant hardships" standard announced in *Sandin*. *McKune*, 536 U.S. at 48, 122 S.Ct. 2017 (O'Connor, J., concurring). She concurred in the judgment only because she felt that the particular consequences threatened for the inmate's refusal to participate in the program—a loss of privileges and transfer to another facility— were not grounds for a Fifth Amendment compulsion claim. Thus, *McKune* is not only factually inapposite to the instant case, it also fails to provide a controlling legal standard for compulsion challenges such as the one lodged by plaintiff here, the latter of which has been recognized by the Second Circuit. *See Jones*, 299 F.3d at 111 n. 2 ("[T]he Supreme Court in [*McKune*] was unable to reach a conclusive decision 'on the question of what standard to apply when evaluating compulsion for the purposes of the Fifth Amendment privilege against self-incrimination in a prison setting'") (quoting *McKune*, 536 U.S. at 48, 122 S.Ct. 2017 (O'Connor, J., concurring)). "When it is not possible to discover

---

6. Indeed, had the consequences of plaintiff's refusal to participate in the SOCP been a mere transfer to another facility or a loss of privileges, the judgment in *McKune* would mandate dismissal of his Fifth Amendment claim as well. *See Searcy v. Simmons*, 299 F.3d 1220, 1225 (10th Cir.2002).

a single standard that legitimately constitutes the narrowest grounds for a decision on that issue, there is then no law of the land because no standard commands the support of a majority of the Supreme Court." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003).

■ Therefore, the proper legal standard for analyzing plaintiff's Fifth Amendment compulsion claim is in need of determination. The Second Circuit has yet to rule on this issue, *see Jones*, 299 F.3d at 111 n. 2 ("We need not take any position on this specific question here, and we do not"), and such standard need not be determined here. Suffice it to say that no matter which principles from Fifth Amendment jurisprudence are adopted, requiring plaintiff as part of the SOCP to divulge a history of sexual conduct, including illegal acts for which no criminal charges have been brought, or else face a loss of good time credits, violates his Fifth Amendment privilege against self-incrimination.

### 1. *McKune plurality: "atypical and significant hardships" (Sandin)*

Though the standard announced by the plurality in *McKune* did not command majority support as representing the standard applicable to Fifth Amendment compulsion challenges by prisoners, it is appropriate to make an independent determination as to whether it is indeed the standard, as was found in the Report–Recommendation. As noted, the plurality in *McKune* stated that no unconstitutional compulsion was present where the conse-

quences an inmate faces for failure to participate in a prison rehabilitative program "are related to the program objective and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." 536 U.S. at 27, 122 S.Ct. 2017.

■ This standard, however, was borrowed from *Sandin*, which purported to determine the proper standard to apply to prisoner due process challenges to prison regulations. For ordinary procedural due process claims, the three-step approach from *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), is utilized to determine if a plaintiff's constitutional rights were violated by a particular state action. The first step of that approach involves identifying the private interest affected by the complained of state action. *City of Los Angeles v. David*, 538 U.S. 715, 123 S.Ct. 1895, 1896, 155 L.Ed.2d 946 (2003). The interest so identified must be a constitutionally protected property or liberty interest. *Weinstein v. Albright*, 261 F.3d 127, 134 (2d Cir.2001). The "atypical and significant hardships" language which the plurality in *McKune* incorporated as the standard for assessing Fifth Amendment compulsion challenges by prisoners came from *Sandin's* definition of a cognizable liberty interest. Particularly, in using the language, the majority in *Sandin* attempted to alleviate concern that the Court's prior decisions— which in defining prisoner state-created liberty interests focused on whether a particular regulation used mandatory or discretionary language—had lowered the hurdle too much for prisoners asserting due process claims.[7]

---

**7.** The Court in *Sandin* also viewed restrictively the other two *Mathews* steps in the prison context, taking great pains to highlight the propriety in deferring to the judgment of prison officials and their punishment of inmates, because doing so "effectuates prison management and prisoner rehabilitative goals." 515 U.S. at 485, 115 S.Ct. 2293. Such a view would appear to significantly disadvantage a prisoner trying to demonstrate that alternative methods were available to prison officials, the second *Mathews* step. The level of deference afforded to the officials would also appear to take out of consider-

"However, nowhere in the relevant jurisprudence does the Supreme Court even hint that an individual attempting to show a violation of his Fifth Amendment privilege must have a protected liberty interest for compulsion to occur," *Lile v. McKune,* 224 F.3d 1175, 1183 (10th Cir.2000); *see also McKune,* 536 U.S. at 58, 122 S.Ct. 2017 (Stevens, J., dissenting) ("None of our opinions contains any suggestion that compulsion should have a different meaning in the prison context. Nor is there any support in our Fifth Amendment jurisprudence for the proposition that nothing short of losing one's livelihood is sufficient to constitute compulsion."); Leading Cases, I. Constitutional Law, F. Self–Incrimination, 116 Harv. L. Rev. 302, 309 (2002) ("[T]here is no support for the proposition that only government actions that violate the Due Process Clause can constitute compulsion"), and the *McKune* plurality's reasons for urging such a merger are neither compelling nor clear.

### 2. *Application of Fifth Amendment principles*

Even though the "atypical and significant hardships" standard for Fifth Amendment compulsion challenges by prisoners was not adopted by a majority of the Supreme Court, and in fact has not been embraced at any noticeable level by any federal court, the analytical conclusions that the plurality reached under that standard did come from analytical questions posed in Fifth Amendment jurisprudence, and are therefore appropriate to address in the overall compulsion inquiry. Admittedly, the plurality in *Sandin* framed its opinion, to a large part, in the context of its conclusion that great deference must be given to the decisions of prison officials. However, the need and extent of this deference is effectively embodied in the balancing test discussed below, *see infra,* and any concern over being able to separate those analytical conclusions from the *Sandin* context in which they were rendered is allayed through the examination of two post-*McKune* decisions, which disagreed that *Sandin* set the appropriate standard but nonetheless agreed, sometimes in a roundabout or indirect fashion, with many of the analytical conclusions reached by the plurality. *See Ainsworth v. Stanley,* 317 F.3d 1 (1st Cir.2002); *Searcy v. Simmons,* 299 F.3d 1220 (10th Cir.2002). The use of those cases, in which the adverse consequences suffered by the prisoner were the loss of good time credits or denial of parole, also adequately addresses any concerns over assessing the plurality's analytical conclusions outside the context of transfers and the loss of prison privileges. Thus, those questions and the conclusions they prompted in the *McKune* plurality opinion and elsewhere are indeed appropriate to assess in determining whether plaintiff's Fifth Amendment claim is viable.

The order in which such questions and conclusions are assessed represents an effort to achieve coherency and avoid repetition. Thus, the myriad and often overlapping Fifth Amendment principles are placed into four categories for the purpose of applying them to plaintiff's claim: (a) the classification of the threatened adverse consequence suffered by plaintiff; (b) the severity of the threatened adverse consequence suffered by plaintiff; (c) whether plaintiff had a "choice" to participate in the "voluntary" SOCP; and (d) whether

---

ation the third *Mathews* step, whether any alternatives could be practically borne by prison officials without hindering their stated interest in effectively managing prisons and advancing rehabilitative goals. Thus, in the due process context, *Sandin* dramatically re-

duced a prisoner's chances of success, not only by setting the bar higher on whether an inmate can demonstrate a liberty interest, but also by all but assuming that the prisoner cannot prevail on any other *Mathews* step.

the State's penological interests are rationally related to the SOCP and its requirements, and whether alternative means exist to advance those interests that do not infringe upon plaintiff's constitutional privilege against self-incrimination. Particularly instructive in making these determinations are the discussions and analytical conclusions from: (1) the plurality opinion and post-*McKune* cases that embraced its analytical conclusions; and (2) the Tenth Circuit Court of Appeals decision that spawned *McKune, Lile,* 224 F.3d 1175, with which the dissent seemed to largely agree. The use of *Lile* is justified in light of the plurality's and concurrence's recognition that the analysis in *McKune* did not involve adverse consequences that could extend the term of an inmate's incarceration, and helpful because the court set forth virtually the entire universe of compulsion principles, and found, incidentally, that the sexual offender treatment program at issue, and the transfer and loss of prison privileges that directly resulted from the inmate's refusal to incriminate himself as part of the program, violated every single one of them.[8]

*(a) classification of adverse consequence suffered by plaintiff*

The first analytical question relevant to whether defendants sought to impermissibly compel plaintiff to incriminate himself is whether the loss of good time credits is more properly characterized as a mere loss of a potential benefit, or as a penalty. The plurality in *McKune* classified the possible adverse consequences in its case—a transfer to a higher-security facility and loss of privileges—inversely, stating that remaining in a medium-security facility and maintaining a certain level of privileges were "minimal incentives" to participate in the sexual offender treatment program. 536 U.S. at 29, 122 S.Ct. 2017. Similarly, in *Searcy,* a case where an inmate challenged the disallowance of good time credits as a result of his refusal to participate in the program, the Tenth Circuit Court of Appeals pointed out that in Kansas (as in New York), good time credits are a matter of legislative grace, and participation in the program does not guarantee an award of the same. 299 F.3d at 1226. Thus, the court referred to the possibility of an award of these non-guaranteed good time credits as an "opportunity" of which the prisoner could "take advantage" by participating in the program. *Id.* Likewise, in *Ainsworth,* where the court was faced with a challenge by an inmate who alleged he was denied parole as a direct result of invocation of his right to silence, the First Circuit Court of Appeals pointed out that the denial of parole was not a new or additional penalty imposed by correctional officials, but rather relief from a sentence already imposed. 317 F.3d at 5.

The Tenth Circuit in *Lile* took issue with the State's argument that the consequences suffered for failure to participate in the program were "a part of the Department's system of privileges and incentives utilized to encourage inmates to participate in programs," noting first that the prisoner had been placed in a medium-security facility before officials recommended he participate in the program, and

---

8. It is worth noting that this decision, like the one in *Lile,* does not purport to set forth the concise and definitive standard for adjudging Fifth Amendment compulsion challenges by prisoners. Developing such a standard from "an already confused area of jurisprudence," *McKune,* 536 U.S. at 46, 122 S.Ct. 2017 (Kennedy, J., plurality), will be left to higher courts. Rather, like *Lile,* this decision will take a more comprehensive approach, applying the vast sea of compulsion principles applied by the various opinions in *McKune* and the federal appellate decisions that followed, and finding that the SOCP, and the loss of good time credits imposed automatically and directly for plaintiff's failure to give up his right to silence and participate in the program, violate every single one of them.

that the program was not part of his sentence or otherwise court-ordered. 224 F.3d at 1188. The court then pointed out that the consequences for failing to participate in this recommended program were "exactly the same as those 'punishments' automatically imposed upon a prisoner for termination from a work assignment for cause, offenses for which felony charges are filed by a state prosecutor, or disciplinary convictions for offenses such as theft, drunkenness, use of narcotics, sodomy, riot, arson, assault, sexual activity, a relationship with staff, and possession of contraband." *Id.* at 1188–89. Thus, the court characterized the transfer and loss of prison privileges suffered by the inmate as "imposing penalties." *Id.* at 1189.

The dissent in *McKune* expanded on this rationale, noting that the inmate's medium-security classification, which was attained only after achieving and maintaining good behavior for a period of six years, "form[s] the baseline against which any change [in circumstances resulting from the invocation of the Fifth Amendment privilege] must be measured[.]" *McKune,* 536 U.S. at 64, 122 S.Ct. 2017. Departing from the classification solely because the inmate invoked his right to remain silent, the dissent stated, "surely constitutes punishment." *Id.* Justice O'Connor, in her concurrence, also regularly referred to the transfer and loss of privileges as "penalties." *Id.* at 50, 51, 52, 122 S.Ct. 2017. These arguments are here found to be compelling.

Relevant to this issue is whether the correctional officials, in meting out the adverse consequence, were doing so because of the inmate's invocation of his Fifth Amendment privilege—in which case such consequence sounds more in punishment—or because of some other reason—in which case it militates toward a loss of a potential benefit. In this regard, because the alleged motivations in *McKune*—bed space and control of prison privileges—are not at issue here, it is largely irrelevant except for the proposition that motivations are important. However, in a case where the motivations of correctional officials mirror those of defendants here, the Tenth Circuit in *Searcy* noted that the motivation in requiring the admission of a sexual history was to facilitate the rehabilitative process, and that no evidence had been presented that the program was being used "as a surreptitious means to obtain evidence for criminal prosecutions." 299 F.3d at 1227; *accord McKune,* 536 U.S. at 34, 122 S.Ct. 2017 (noting that no evidence had been presented that information divulged in the program was used for later criminal prosecutions). Thus, despite the fact that refusal to participate in the program automatically resulted in the loss of good time credits, the court found this less attributable to a motivation to penalize the prisoner for invoking his right to silence, and more "a consequence of his inability to complete the rehabilitation process the [officials] had determined ... [was] in the best interest for [the prisoner] and society." *Searcy,* 299 F.3d at 1227; *see also Johnson,* 108 F.3d at 11 ("[S]tate officials are permitted to take adverse administrative action for failure to respond to inquiries, even where the answers might tend to incriminate, so long as the adverse consequence is imposed for failure to answer a relevant inquiry and not for refusal to give up a constitutional right").

Here, "the question at hand is not whether [defendants] could have refused to extend [good time credits] in the first place, but rather whether revoking them at this point constitutes a penalty for asserting the Fifth Amendment privilege." *McKune,* 536 U.S. at 66, 122 S.Ct. 2017 (Stevens, J., dissenting). The threat of losing good time credits is more properly classified as a penalty for his invocation of his right to silence than a stripping away of a benefit he potentially could have re-

ceived as a result of his participation in the SOCP. All else being equal, to the extent the question is posed in "but for" form, there is little doubt that plaintiff would not have had his good time credits threatened but for his failure to participate in the SOCP.

That plaintiff has not put forth any allegations that criminal prosecutions regularly result from information disclosed in the SOCP is irrelevant. Because such information undoubtedly could be used in a future prosecution, despite it never before having been done, *McKune*, 536 U.S. at 35, 122 S.Ct. 2017 (recognizing that State has left option to prosecute open), such a fact can have no more than a limited impact on the analysis. In fact, the SOCP policy and procedure manual *requires* that SOCP counselors report to authorities "evidence of child physical and/or sexual abuse that has occurred or is planned and any specific details of previous crimes for which the offender has not been charged." (Docket No. 44, App.)

One can wax philosophical all he or she wants as to the true motivations of the correctional officials, but it takes little imagination to conceive that such officials would threaten or impose the loss of good time credits as a direct result of the inmate's failure to participate in a "recommended" program.[9] That an unheeded "recommendation" automatically results in such a consequence informs plaintiff and all other inmates following him that the "recommendation" is, in actuality, an order, a proposition repeatedly highlighted by the dissent in *McKune*. *See McKune*, 536 U.S. at 56, 60, 62, 122 S.Ct. 2017 (characterizing recommendation to participate in program as an order). This is not to say that such motivations are not grounded in good intentions. Indeed, no one can properly say that convicted sex offenders should not seek treatment, which may certainly involve an acceptance of responsibility, or should not be advised, in the strongest terms possible, that such treatment may benefit them mentally as a person who will once again live in the free world. However, when the refusal to embrace such well-intentioned advice or encouragement is directly greeted with an executed threat, one cannot help but conclude—in logic, common sense, and the circumstances—that the refusing inmate has been penalized.

### (b) the severity of the adverse consequences suffered by plaintiff

That plaintiff was threatened with a penalty for invoking his right to silence, however, does not automatically mean that the Fifth Amendment was violated. Courts have found it appropriate to assess the severity of the penalty, in recognition of the reality that a prisoner is less likely to have felt "compelled" if the consequence attached to refusing to waive the privilege against self-incrimination was not of a serious nature. In *McKune*, the plurality and concurrence heatedly disagreed with the dissent and the court in *Lile* over whether a transfer and loss of prison privileges were sufficiently severe adverse consequences to give rise to a Fifth Amendment claim. The plurality, in determining the nature of the consequences, expressly noted that the inmate's "decision not to participate in the Kansas SATP did not extend his term of incarceration. Nor did his decision affect his eligibility for good-time credits or parole." *McKune*, 536 U.S. at 38, 122 S.Ct. 2017. Justice O'Connor was also cautious to exclude from her non-severe determination consequences like the one suffered by plaintiff here, noting that penalties such as "longer incarceration and execution . . . are far greater than

---

9. Indeed, the documentation that plaintiff attempted to attach to his proposed third amended complaint says just that. *See supra* note 1.

those we have already held to constitute unconstitutional compulsion in the penalty cases." *Id.* at 52, 122 S.Ct. 2017 (O'Connor, J., concurring).

*Ainsworth* and *Searcy* do not directly address this issue, instead obliquely citing the fact that good time credits and parole are "matter[s] of legislative grace." *See Searcy*, 299 F.3d at 1226. Such a statement, however, tends to divert attention away from the relevant inquiry—whether plaintiff was threatened with an adverse consequence for invoking his right to silence. As noted, *supra*, whether plaintiff had a constitutionally protected interest in good time credits, while perhaps relevant in the due process context, is not relevant in the Fifth Amendment context. Taking the allegations in plaintiff's complaint as true, his good time credits were threatened directly as a result of his decision to invoke his right to silence. The allowance of such credits would have reduced his term of incarceration. One can hardly think of more serious consequences attached to invocation of the privilege.

To the extent the severity of the consequence is judged from the standpoint of a reasonable prison inmate, there is little doubt that a prisoner would rather have good time credits, and be eligible for release from incarceration at an earlier date, than lose good time credits, or have them disallowed. It is noteworthy in this sense to distinguish the adverse consequences at issue here—the loss of good time credits—from the ones both the plurality and concurrence in *McKune*—a transfer and reduction in privileges—found insufficient to form the basis of a compulsion challenge. A transfer and loss of privileges does not change the overall fact that the prisoner is still incarcerated. Such losses may provide some background for a decision as to whether good time credits will be allowed,

or whether the prisoner will be awarded parole, but only indirectly. The loss of good time credits in the first instance, as plaintiff here faced, would change the fact of incarceration to the extent such credits impact the length of incarceration. Therefore, the consequences faced by plaintiff for his invocation of the privilege against self-incrimination were serious and potent.

*(c) whether plaintiff had a "choice" to participate in the "voluntary" SOCP*

If plaintiff truly had a choice whether to participate in the SOCP, one would be hard pressed to find that defendants attempted to compel self-incrimination. There is no question that the SOCP was not part of plaintiff's sentence. He was instead "recommended" to partake in the program by a counselor. According to the plurality in *McKune*, this "recommended" feature of a program is enough to find that a prisoner is simply given a voluntary choice. *See McKune*, 536 U.S. at 44, 122 S.Ct. 2017 ("If respondent was not compelled to participate in the [program], his participation was voluntary in the only sense necessary for our present inquiry"). As the plurality stated, "[i]t is beyond doubt, of course, that [the inmate] would prefer not to choose between losing privileges and accepting responsibility for his past crimes. It is a choice, nonetheless, that does not amount to compulsion." *Id.* at 45, 122 S.Ct. 2017; *accord Searcy*, 299 F.3d at 1226 ("The fact that the [correctional facility] [would] not let [the inmate] complete the [program] unfettered by its more unpleasant aspects does not render his original choice to enter the program any less voluntary"); *Ainsworth*, 317 F.3d at 5 (finding significant fact that program was "voluntary," not "assigned").[10]

This wooden application of the terms "voluntary" and "choice" is rejected, as it

---

**10.** The Tenth Circuit's about-face regarding this and other analytical factors that go into

the Fifth Amendment analysis is difficult to

has been in other analogous areas of the law where a person technically has a choice, but it is defined in such a way as to make the choice itself improper under the law. For example, assume that an employee-at-will has made substantial and successful efforts to ensure that her work product is competent. Assume further that this employee, however, has been subject to intolerable work conditions in the form of insulting and unwarranted verbal barrages, and hollow threats of termination, by her superiors. In a technical sense, this employee may "choose" to remain in her position, to which she has no entitlement but to which she is not in danger of being fired, or she may "choose" to quit her job. Assume that the employee "chooses" the latter option.

Under such circumstances, the law is clear that the employee may have a cause of action for constructive discharge, because her working conditions have become "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89–90

(2d Cir.1996) (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987)). In other words, the "choice" is not really a "choice" at all because, by their actions, the employee's supervisors have forced her hand.

Like the employee in the hypothetical is not entitled to her job, plaintiff is not entitled to good time credits, but, like the employee in the hypothetical, there is no evidence that he was in danger of losing such credits in the absence of the SOCP. Like the verbal assault and threats of termination that the employee would have had to endure if she chose to keep her job, plaintiff here would have been forced to incriminate himself, opening himself up to possible future prosecution, if he opted to participate in the SOCP. The alternative for plaintiff, like the alternative of losing income faced by the employee in the hypothetical, was to lose the good time credits. A crucial difference does exist between the hypothetical and plaintiff's case—the constructively discharged employee has lost her job; plaintiff was faced with losing the opportunity to be free from incarceration at an earlier date.[11]

understand. In *Lile*, where the adverse consequences for failure to participate in the sexual offender treatment program were a transfer and loss of privileges, the Tenth Circuit noted the lack of a truly voluntary choice for the prisoner. In *Searcy*, where the adverse consequences were much more severe than those faced by the prisoner in *Lile*, and were in fact of the type from which the already-issued plurality and concurrence in *McKune* implicitly disclaimed its analysis, the Tenth Circuit stated that the inmate did indeed have a choice. Likewise, whereas the court in *Lile* found that a transfer and loss of prison privileges were penalties for invocation of the privilege against self-incrimination, the court in *Searcy* found that a loss of good time credits was "an opportunity" of which the prisoner failed to "take advantage" by invoking his right to silence. In light of the facts that the plurality and concurrence hinted that the analysis may change if the adverse consequences were of the exact type faced by the

court in *Searcy*, and that the standard announced by the court in *Lile* was used in determining if less serious adverse consequences were impermissible penalties in violation of the Fifth Amendment, it would seem to follow that the court in *Searcy* would set forth a standard either the same or less restrictive than the one announced in *Lile*. It did not do this, and the reasons for the court's departure from its own precedent are unclear.

11. It is recognized that Justice O'Connor, in her concurring opinion in *McKune*, distinguished the consequence of losing one's job from the consequence of being transferred to a higher-security prison and losing prison privileges. *See McKune*, 536 U.S. at 49–51, 122 S.Ct. 2017. However, because she also implicitly grouped with the former penalties that could result in "longer incarceration [or] execution," *id.* at 52, 122 S.Ct. 2017, an example of which is the disallowance of good

Also weighing against any finding that plaintiff truly had a choice in the matter was the automatic character of the adverse consequence, and that such consequence was directly imposed for plaintiff's invocation of his right to silence. Plaintiff has not just alleged that disallowance of good time credits *might* follow his refusal to participate in the recommended program. He has alleged that he was informed that such a disallowance *would* follow such a refusal. If true, such an allegation, paired with the severity of the consequence, *see supra*, would certainly render any "choice" to enter the SOCP far less than voluntary.

As the other side of the same coin, the fact that a refusal to participate in the SOCP, "standing alone and without regard to other evidence," would result in the disallowance of good time credits also weighs toward finding that defendants attempted to force plaintiff to participate. *See Lile*, 224 F.3d at 1186 (internal quotations and citations omitted) (distinguishing *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), relied upon by the plurality, where the Supreme Court found no compulsion because the inmate's silence, "in and of itself," was not sufficient to warrant the complained of adverse consequence); *id.* ("In light of the fact that the Department would impose sanctions solely because Plaintiff wishes to remain silent invoke his Fifth Amendment right against self-incrimination, we cannot see how his participation in the SATP is truly voluntary").

Thus, as noted, in light of the severe nature of the loss of good time credits, the automatic imposition of such loss, and the causal connection between the imposition of such loss and plaintiff's invocation of his Fifth Amendment right, the fact that participation in the SOCP was labeled "recom-

mended" or "voluntary" is not dispositive of the issue of whether plaintiff truly had a choice in the matter. Such facts precipitate a finding that plaintiff was "ordered," not recommended, to participate in the program. *See Lile*, 224 F.3d at 1187 (distinguishing *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), relied upon the plurality, where the Supreme Court found no compulsion because the inmate was not ordered to do anything, and his participation in a clemency interview was not determinative of whether he would be granted release); *McKune*, 536 U.S. at 60, 122 S.Ct. 2017 (Stevens, J., dissenting) (same).

### (d) balancing approach

Even though every Fifth Amendment issue addressed thus far has been resolved in plaintiff's favor, "it is [still] appropriate to balance the prison's penological interests against [plaintiff's] constitutional rights." *Lile*, 224 F.3d at 1190. Though the *McKune* dissent's reluctance at using such a balancing test, because "[t]he State's interest in law enforcement and rehabilitation are present in every criminal case[,] [and] [i]f those interests were sufficient to justify impinging on prisoners' Fifth Amendment rights, inmates would soon have no privilege left to invoke," *McKune*, 536 U.S. at 69, 122 S.Ct. 2017, is shared, the test will nonetheless be employed both "[b]ecause of the institutional context of this case and the great deference that is owed to the management decisions and policies of prison officials," *Lile*, 224 F.3d at 1190, and because such interests and such deference were the most constant and consistent factors cited by the *McKune* plurality as support for its opinion.

---

time credits, it is here opined that she would not object to the use of the constructive dis-

charge analogy.

As an initial matter, such interests are worth defining. The asserted interest in the SOCP, and its requirement that a participant divulge potentially incriminating information or else face a loss of good time credits, is not the effective management of prisons. Rather, the interest for such a program and its requirements must be derived from the State's desire to rehabilitate sex offenders, thereby ensuring the safety of the public when such offenders are eventually released from incarceration.

It is also worth pointing out that these interests are indeed legitimate. As the plurality in *McKune* pointed out, "[s]ex offenders are a serious threat in this Nation[,]" as evidenced by the fact that their representation in the prison population has "increased at a faster rate than for any other category of violent crime." 536 U.S. at 32, 122 S.Ct. 2017. Further, "a majority of reported forcible sexual offenses were committed against persons under 18 years of age[,]" and "[n]early 4 in 10 imprisoned violent sex offenders said their victims were 12 or younger." *Id.* at 32–33, 122 S.Ct. 2017. Moreover, as noted by the plurality, sex offenders are more likely than any other criminal offender to repeat their crimes once released, and sexual offender treatment programs can aid in the reduction of such recidivism. *Id.* at 33, 122 S.Ct. 2017. "An important component of [such] ... programs requires participants to confront their past and accept responsibility for their misconduct." *Id.* Thus, a sub-interest of the overall general rehabilitation interest, and the focus of the analysis below, is the State's interest in requiring sex offenders, as part of a treatment program, to divulge a sexual history, including criminal acts for which they have not been criminally charged, as part of the overall effort to rehabilitate such offenders in preparation for their re-entry into society.

Though the courts in *Lile* and *Ainsworth* stated the components of the balancing test in different ways, both courts cite as authority for the test the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *See Ainsworth*, 317 F.3d at 5 (quoting *Beauchamp v. Murphy*, 37 F.3d 700, 705 (1st Cir.1994) (citing *Turner*, 482 U.S. at 89–91, 107 S.Ct. 2254)); *Lile*, 224 F.3d at 1190 (quoting and citing *Turner*, 482 U.S. at 89–91, 107 S.Ct. 2254). These components can be paraphrased as follows: (1) whether there is a "valid, rational connection" between the SOCP and its requirements and the State's interests in requiring program participants to divulge their sexual histories as part of the rehabilitative process; (2) whether there are alternative means by which plaintiff could have asserted his constitutional privilege against self-incrimination, in light of the deference accorded to prison officials; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there exist "obvious, easy alternatives" that "fully accommodate[ ] the prisoner's rights at a *de minimis* cost" to the State's interest in requiring program participants to divulge their sexual histories as part of the rehabilitative process. *See Turner*, 482 U.S. at 89–91, 107 S.Ct. 2254; *Ainsworth*, 317 F.3d at 5; *Lile*, 224 F.3d at 1190.

As noted *supra*, there does exist a valid, rational connection between the SOCP, along with its requirements, including the threat faced for non-participation, and the State's interest in requiring program participants to divulge their sexual histories as part of the larger interest in rehabilitating prisoners for safe return to society. With respect to the second *Turner* component, plaintiff could not maintain his privilege against self-incrimination and, at the

same time, participate in the SOCP. There is no evidence regarding the impact accommodating plaintiff's constitutional right will have on inmates, prison staff, and the resources of the facility. However, the Court in *Turner*, in announcing this component, expressed concern for situations where an accommodation would have a "ripple effect" throughout the prison, thereby possibly straining the facility's ability to cope with the change. With no evidence of this possibility, this component appears to be irrelevant.

It is the fourth *Turner* factor—whether there exist "obvious, easy alternatives" that "fully accommodate[ ] the prisoner's rights at a *de minimis* cost" to the State's interest in requiring program participants to divulge their sexual histories as part of the rehabilitative process—that has sparked the most debate. The most suggested alternative is the offering to SOCP participants of use immunity for any statements about their sexual history they make during the course of the program. Where use immunity is offered to a person, "a [S]tate may validly insist on answers to even incriminating questions . . . , as long as it recognizes that the required answers may not be used in a criminal proceeding." *Minnesota v. Murphy*, 465 U.S. 420, 436 n. 7, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

While the court in *Ainsworth* declined to address whether granting use immunity was a viable alternative to requiring otherwise naked disclosures of incriminating statements, 317 F.3d at 5 (stating that such an issue was for the state to decide), the plurality in *McKune* found that a State's decision to not offer use immunity for inmates participating in sexual offender treatment programs was valid on two grounds. "First, the professionals who design and conduct the program have concluded that for [program] participants to accept full responsibility for their past ac-

tions, they must accept the proposition that those actions carry consequences. . . . If inmates know society will not punish them for their past offenses, they may be left with the false impression that society does not consider those crimes to be serious." *McKune*, 536 U.S. at 34, 122 S.Ct. 2017. "Second, while [the State] as a rule does not prosecute inmates based upon information revealed in the course of the program, [it] confirms its valid interest in deterrence by keeping open the option to prosecute a particularly dangerous sex offender." *Id.* The plurality also noted that other states, as well as the Federal Bureau of Prisons, likewise do not offer immunity for statements made in their sexual offender treatment programs. *Id.*

The court in *Lile*, however, found that granting use immunity, which "has been contemplated by the Supreme Court since the very inception of the Fifth Amendment right against self-incrimination," was an appropriate alternative to requiring inmates to disclose potentially incriminating information with no protection against its future use. 224 F.3d at 1191. Contrary to the plurality's reasoning, the dissent in *McKune* found, "[i]n fact, [that] the program's rehabilitative goals would likely be furthered by ensuring free and open discussion without the threat of prosecution looming over participants' therapy sessions" if use immunity were granted. 536 U.S. at 69–70, 122 S.Ct. 2017.

An alternative, offered the dissent, was simply making the sexual offender treatment program truly voluntary, like the Federal Bureau of Prisons' program cited by the plurality. No use immunity is attached to participation in that program, but inmates are not compelled to participate. An inmate choosing to participate is transferred to a "more desirable" facility, "but if he refuses to participate in the first

place, ... he suffers no negative consequences." *Id.* at 71, 122 S.Ct. 2017.

Granting program participants use immunity for any statements they make in the course of the SOCP is an obvious, easy alternative that imposes a *de minimis* cost, if any, upon the State's valid penological interests. Simply because the exact statements of the inmate may not form the basis of a subsequent criminal prosecution does not mean that the inmate, in disclosing the statement, is not recognizing that he must accept responsibility for his actions. In fact, his decision to participate in the program itself—a recognition that he needs treatment—not to mention the fact that he is likely incarcerated for a substantial period of time as a result of a conviction of or plea bargain to a sex offense, both indicate that grasping the consequences of his actions is not only present, but foremost, in the inmate's mind.

■ Furthermore, it is not as if the State, by offering use immunity, is foreclosed from prosecuting the inmate in the future on the admitted acts. It is helpful in this regard to distinguish use immunity from other types of immunity. As noted, a State offering an inmate use immunity—or its extension, derivative use immunity— would not be able to use *the statements disclosed,* or information derived from such statements, in a future prosecution. More sweeping than use/derivative use immunity is transactional immunity, which if offered precludes the State from later prosecuting an inmate for the *offense* disclosed. *See United States v. Nanni,* 59 F.3d 1425, 1431 (2d Cir.1995). Thus, an offer of only use immunity would not prohibit the State from conducting an independent investigation, and collecting independent evidence, of the divulged crimes, or in bringing charges. *See Kastigar v. United States,* 406 U.S. 441, 467, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (holding that derivative use and use immunity did not

violate the Fifth Amendment); *see also id.* (Marshall, J., dissenting) ("Today the court holds that the United States may compel a witness to give incriminating testimony and subsequently prosecute him for crimes to which that testimony relates").

Further, the purported need to keep open the possibility of prosecuting especially dangerous sex offenders for the statements disclosed does not seem to square with the assertion that the program is used for rehabilitation, and not as "a mere subterfuge for the conduct of a criminal investigation." *McKune,* 536 U.S. at 34, 122 S.Ct. 2017 (Kennedy, J., dissenting). In other words, it would be an unfair double-dipping to permit the State, on one hand, to require a waiver of the Fifth Amendment privilege under the guise of rehabilitation, while on the other hand to transform its interest into criminal investigation once it felt, in its judgment, that a particular statement required prosecution. Allowing such a dichotomy, especially in a prison context, would render hollow any Fifth Amendment privilege against self-incrimination in rehabilitation programs that often go hand in hand with the admission of potentially incriminating statements. The State's varied and sometimes conflicting interests and motivations would always be found to trump the constitutional right.

The plurality in *McKune* complains that "[a]sking at the outset whether prison administrators can or should offer immunity skips the constitutional inquiry altogether. If the State ... offered immunity, the self-incrimination privilege would not be implicated." 536 U.S. at 35, 122 S.Ct. 2017. It is unclear why, however, the plurality does not desire avoiding the negative implication of a constitutional right. If use immunity offers a sensible way to protect constitutional rights without infringing on legitimate penological inter-

ests, it would make little sense not to consider it. Alternatively, it would make little sense not to consider whether the SOCP could be modified—again, without significantly impairing legitimate penological interests—in other ways, such as maintaining requirements without use immunity, but not attaching to a refusal to participate the loss of good time credits, much like the Federal Bureau of Prisons' program.

Therefore, in the absence of any other evidence as to the burden allowing inmates to keep their Fifth Amendment rights would have on the rehabilitative interest (and all other sub-interests therein), it is here found that, taking the allegations in the complaint and opposition papers as true, offering inmates use immunity and simply making the program truly voluntary are obvious, easy, and appropriate alternatives to the SOCP in its present form.

### C. Qualified Immunity

■ In their motion to dismiss, defendants have also asserted the defense of qualified immunity. "Qualified immunity shields [State employees] from personal liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known[.]" *Mollica v. Volker*, 229 F.3d 366, 370 (2d Cir.2000) (internal quotations and citations omitted). Even though a prisoner's right to be free from compelled self-incrimination has been long established, *see Baxter*, 425 U.S. at 316, 96 S.Ct. 1551, the standard defining that right, as is shown by the lengthy discussion above, has not and is not. Courts have not reached a consensus on the proper legal parameters of such right; the individual defendants should not have been expected to solve the riddle either.

■ Therefore, plaintiff is not entitled to recover compensatory and punitive damages against defendants. Qualified immunity does not, however, mandate dismissal of the second amended complaint, as plaintiff also seeks declaratory and injunctive relief for the alleged violation of his Fifth Amendment rights. *See Ford v. Reynolds*, 316 F.3d 351, 356 n. 3 (2d Cir. 2003) (claims for declaratory relief are not barred by qualified immunity defense); *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir.2002) ("[Q]ualified immunity is not a defense when [injunctive] relief is sought"). Accordingly, the "Damage Relief" section of the second amended complaint, which includes plaintiff's request for $1.5 million in compensatory damages and $5 million in punitive damages, will be dismissed, as will all portions of the "Relief Requested" and "Injunctive Relief" sections that do not relate to the Fifth Amendment claim discussed herein.

## VI. CONCLUSION

The recommendation that plaintiff's equal protection, privacy, due process, and Fifth Amendment, insofar as it relates to the alleged threatened denial of parole, claims be dismissed will be adopted. However, taking as true the factual allegations, it cannot be said that the complaint fails to state a viable cause of action under the Fifth Amendment, insofar as it relates to the alleged threat of the loss of good time credits. Application of virtually every principle from compulsion jurisprudence cuts in plaintiff's favor on the facts alleged. Also to be dismissed are those portions of the second amended complaint seeking compensatory and punitive damages, as well as those portions of the relief requested not relating to the part of plaintiff's Fifth Amendment claim that does survive defendants' motion to dismiss.

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss the second amended complaint is GRANTED as to plaintiff's privacy claim, equal protection claim, due process claim, and Fifth Amendment claim insofar as it relates to the denial of parole, and such claims are DISMISSED;

2. Defendants' motion to dismiss the second amended complaint is DENIED as to plaintiff's Fifth Amendment claim insofar as it relates to the loss of good time credits;

3. The "Damage Relief" portion of the second amended complaint, as well as the portions of the "Relief Requested" and "Injunctive Relief" sections that do not relate to the surviving part of the Fifth Amendment claim, are DISMISSED; and

4. Defendants are directed to serve and file an answer to the surviving portions of the second amended complaint on or before May 7, 2004.

IT IS SO ORDERED.